**E-FILED**
Tuesday, 31 May, 2005 03:36:30 PM
Clerk, U.S. District Court, ILCD

# COLLECTIVE BARGAINING AGREEMENT

Between

**Central Illinois Builders of A.G.C.**
**Builders Association of Tazewell County**
**McLean County Contractors Group**
**Greater Peoria Contractors and**
**Suppliers Association, Inc.**

And

**Mid-Central Illinois Regional**
**Council of Carpenters**





SPRINGFIELD, LOCAL #16
CHAMPAIGN, LOCAL #44
BLOOMINGTON, LOCAL #63
PEORIA, LOCAL #183
QUINCY, LOCAL #189
DANVILLE, LOCAL #269
MATTOON, LOCAL #347
PEKIN, LOCAL #644
LITCHFIELD, LOCAL #725
DECATUR, LOCAL #742
JACKSONVILLE, LOCAL #904
MILLWRIGHTS, LOCAL #1051

**MAY 1, 2003 through APRIL 30, 2006**

EXHIBIT
A
tabbies

# COLLECTIVE BARGAINING AGREEMENT

Between

**Central Illinois Builders of A.G.C.**
**Builders Association of Tazewell County**
**McLean County Contractors Group**
**Greater Peoria Contractors and**
**Suppliers Association, Inc.**

And

## Mid-Central Illinois Regional Council of Carpenters



SPRINGFIELD, LOCAL #16
CHAMPAIGN, LOCAL #44
BLOOMINGTON, LOCAL #63
PEORIA, LOCAL #183
QUINCY, LOCAL #189
DANVILLE, LOCAL #269
MATTOON, LOCAL #347
PEKIN, LOCAL #644
LITCHFIELD, LOCAL #725
DECATUR, LOCAL #742
JACKSONVILLE, LOCAL #904
MILLWRIGHTS, LOCAL #1051

**MAY 1, 2003 through APRIL 30, 2006**

*Notes*

# INDEX

| | Page |
|---|---|
| Agreement. | 1 |
| Apprentices | 33 |
| Arbitration | 31 |
| Area Jurisdiction By County | 48 |
| Checkoff Per Capita Tax | 43 |
| Corporate Signature Authority and Wage Addendums | 47 |
| Drug and Alcohol Policy | 45 |
| Duration | 47 |
| Employers Working | 39 |
| Entire Agreement of the Parties | 46 |
| Foreman, General Foreman, Working Foreman | 21 |
| Fringe Benefits | 41 |
| General Conditions | 22 |
| Grievance Procedure | 30 |
| Hiring | 18 |
| Holidays | 29 |
| Hours of Work and Overtime | 23 |
| Incorporation of Addendum | 44 |
| Industry Advancement Fund | 42 |
| Jurisdictional Disputes | 29 |
| Jurisdictional Map | 49 |
| Lathers Scope of Agreement | 11 |
| Management Rights | 15 |
| Memorandum of Agreement | 51 |
| Millwright Scope of Agreement | 6 |
| Miscellaneous | 41 |
| MLCCI, T.E.A.M., TRICON | 33 |
| Mutual Amendment | 45 |
| No Strike - No Lockout | 32 |
| Optional 4-10 Hour Work Week | 26 |
| Piledrivers Scope of Agreement | 10 |
| Pre-job Conference | 18 |
| Protective and Life Savings Equipment | 44 |
| Purpose | 2 |
| Recognition | 16 |
| Reporting | 44 |
| Savings Clause | 32 |

# INDEX

|  | Page |
|---|---|
| Scope of Agreement | 2 |
| Signature Page | 50 |
| Subcontracting | 29 |
| Tile, Marble, Terrazzo Finishers Scope of Agreement | 12 |
| Tools and Equipment | 39 |
| Trust Agreements, etc. | 36 |
| Union Representation | 17 |
| Union Security | 16 |
| Validity | 1 |
| Wages, Fringes, and Payday | 27 |
| Wage Addendums | 47 |
| Witnesseth | 1 |

Wage Addendums are available upon request from the Mid-Central Illinois Regional Council of Carpenters, affiliated Local Unions and Signatory Contractor Associations.

## MID-CENTRAL ILLINOIS
## REGIONAL COUNCIL OF CARPENTERS

## COLLECTIVE BARGAINING AGREEMENT

**THIS AGREEMENT** made this **1st day of May, 2003,** between the **Central Illinois Builders Chapter of AGC, Builders Association of Tazewell County, McLean County Contractors Group and Greater Peoria Contractors and Suppliers Association, Inc.,** hereinafter called **"Employer"** and the **Mid-Central Illinois Regional Council of Carpenters,** in behalf of the Local Unions under its jurisdiction all of which are affiliated with the **United Brotherhood of Carpenters and Joiners of America,** hereinafter called **"Union".**

Any Employer, not a member of the Employer Association as referred to above, may receive the benefits and assume the obligations of this Agreement with the Union by signing the original copy of this Agreement and by agreeing to be bound by the terms and provisions thereof.

## WITNESSETH

**WHEREAS,** the parties have heretofore, through a series of negotiations and conferences, come to mutual agreement on various matters affecting the relationship between the parties, and are desirous of reducing said agreements to writing.

The Employer members of the Associations are engaged primarily in the Building and Construction Industry, and as such, the Employers, the Associations and the Union have a common interest in same. The Associations and the Union hereby pledge themselves to the highest degree of harmony and good faith in the performance of this Agreement. The Employer members of the Associations being in the Building and Construction Industry, believe excellence and safety of endeavor are prime requisites to the continuation and success of the business of each Employer.

## VALIDITY

In the event that any Article, Paragraph or Section of this Agreement, and any Amendments thereof, shall be invalid, then neither of the parties hereto shall be bound to said portion invalid, but that the said Articles, Paragraphs and Sections shall be deemed to be separable, and the invalidity of any portion thereto shall not affect the validity of the remainder.

# ARTICLE I
## PURPOSE

**Section 1.** The purpose of this Agreement is to promote efficiency of construction operations and provide for peaceful settlement of labor disputes without strike or lockout on all projects covered by this Agreement.

**Section 2.** It is also the intent of the parties to set out uniform standard working conditions for the efficient operation of said construction work, to establish and maintain harmonious relations between and among all parties to the Agreement, to secure optimum productivity and to eliminate strikes, lockouts or delays in prosecution of the work undertaken by the Employer.

**Section 3.** This Agreement is an effort by the parties to implement those improvements which will encourage Buyers of construction services to utilize the Employer and the Employee Unions signatory to this Agreement.

# ARTICLE II
## SCOPE OF AGREEMENT

**Section 1.** The parties to this Agreement recognize that it may be in the best interest of the Construction Industry for various craft unions to consolidate and/or merge, and therefore hereby agree that if any Local or International Union legally agrees to merge or consolidate with the United Brotherhood of Carpenters and Joiners of America or the Mid-Central Illinois Regional Council of Carpenters or any of its affiliates, the Scope of Work as contained at that time in that particular Crafts Agreement shall immediately become part of the Scope of Work Clause in the Mid-Central Illinois Regional Council of Carpenters Agreement.

**Section 2.** This Agreement shall apply to all construction, repair, and rehabilitations and all industrial maintenance work not covered by a maintenance agreement.

**Section 3.** This Agreement shall cover all employees employed by the Employer engaged in work coming under all classifications listed under the trade autonomy of the United Brotherhood of Carpenters and Joiners of America.

**Section 4.** The following Forty-one (41) counties shall be covered: Adams, Brown, Cass, Champaign, Christian, Clark, Coles, Crawford, Cumberland, DeWitt, Douglas, Edgar, Effingham, Ford, Fulton, Greene, Hancock, Jasper, Knox, Livingston, Logan, McDonough, McLean, Macon, Macoupin, Mason, Menard, Montgomery, Morgan, Moultrie, Peoria, Piatt,

-2-

Pike, Sangamon, Schuyler, Scott, Shelby, Tazewell, Vermilion, Warren and Woodford.

**Section 5.** The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork and composition, and all other substitute materials. The handling, cleaning, erecting, installation and dismantling of machinery, equipment and all materials used by members of the United Brotherhood.

**Section 6.** The Unions claim of our jurisdiction extends over all the divisions and subdivisions of the trade including the following: Carpenters and Joiners; Millwrights; Pile Drivers; Tile, Marble, Terrazzo Finishers, Shopworkers, Granite Cutters; Bridge, Dock and Wharf Carpenters; Divers; Underpinners; Timbermen and Core Drillers; Lathers, Shipwrights, Boat Builders, Ship Carpenters, Joiners and Caulkers; Cabinet Makers, Bench Hands, Stair Builders, Millmen; Wood and Resilient Floor Layers and Finishers; Carpet Layers; Shinglers; Siders; Insulators; Acoustic Drywall Applicators; Shorers and House Movers; Loggers; Lumber and Sawmill Workers; Furniture Workers; Reed and Rattan Workers; Shingle Weavers; Casket and Coffin Makers; Box Makers, Railroad Carpenters and Car Builders, regardless of material used; and all those engaged in the operation of woodworking or other machinery required in the fashioning, milling or manufacturing of Products used in the trade, and the handling, erecting and installing materials on any of the above divisions or subdivisions, burning, welding, rigging and the use of any instrument or tool for layout work incidental to the trade. The layout work for all buildings, houses and apartments, foundations, etc to include the erection of all batter boards, and to include the use of all tools and instruments in connection thereof. The installation of all piling for buildings and structures of all types whether of wood, metal, or concrete. The installation of all sheet piling and bracing of same. The installation of all shoring, underpinning and lagging. The installation of all caissons. The removal of all materials pertaining to Pile Drivers work. The fabrication, erection, stripping and dismantling of all concrete forms whether of wood, metal or composition form materials for houses, apartment buildings and structures of all sorts. This includes, but is not limited to footing forms, wall forms, foundation forms of all descriptions, forms for concrete floors, beams and columns including shoring thereof, screeds, bulkheads, the setting of all anchor bolts, and any rig-

-3-

ging thereof. The fabrication, erecting and dismantling of all falsework. The rigging, setting, fastening, aligning, leveling and bracing of all precast concrete members. The fabrication and erection of all framework for houses or apartments of any and all descriptions. The erection of all prefabricated components for houses or apartments or other buildings whether manufactured on the job site or in a manufacturing plant. The installation of all materials for exterior trim on houses or apartments including sid- ing, windows, doors; other exterior trim including fascias and soffits, mouldings, foam spray and roof covering materials. The installation of all material for interior trim on houses or apart- ments including, doors and frames, cabinets, stairways, all other mouldings, doors and frames, cabinets, stairways, all other materials classified as trim, and the installation of all hardware of any type or description. The installation, repair, and mainte- nance of all locks and hardware for all doors and windows including roll up doors. The fabrication, erection of all framework, blocking and furring, whether of wood or metal, on commercial, institutional or industrial buildings. The installation of all exterior trim materials whether of wood, metal or composition, on com- mercial, institutional or industrial buildings, to include, but not limited to windows, doors and frames, siding, fascias and soffits, canopies, store fronts, etc., and to include any blocking, furring and framing thereof. The fabrication and erection of all partitions on commercial, institutional and industrial buildings whether of wood, metal or composition materials. The installation of all wall and ceiling materials of wood, metal or composition materials on commercial, institutional and industrial buildings classified as interior trim such as mouldings, shelving, trim of all types and descriptions. The installation of all doors and frames, walk-in coolers, whether of wood, metal or composition materials on commercial, institutional or industrial buildings. The installation of all cabinets, stairways, store fixtures of all types and descrip- tions whether of wood, metal or composition materials on com- mercial, institutional or industrial buildings. The installation of all shower doors and tub enclosures. The application of acoustical materials of all types and descriptions and no matter what the method of installation. The installation of acoustical suspended ceilings in their entirety, including the installation of hangers, channels, framing and trim, whether of wood, metal or other materials; the installation of all insulation whether glued, nailed or blown. The installation in all buildings, houses and apartments and materials of all types classified as "Drywall" including the installation of metal studs or framing in connection therewith. The installation in all buildings of floor covering materials no matter what the method of installation, and whether of wood,

linoleum, asphalt, rubber, vinyl, asbestos, and other materials. The installation in all buildings, houses and apartments of rugs or carpets of all types and descriptions no matter what the method of installation. The building, erection and dismantling of all scaffolding and staging. The building, erection of store, office, bank and other fixtures, racks, shelves, whether of wood, metal or other materials. The installation of all laboratory equipment, including cabinets and workbenches, bookcases, cabinets either separately or used in conjunction with heating and/or air condi- tioning units, blackboards, bulletin boards, billboards, meter- boards, and boards of all types. The assembling and setting of all seats in the theaters, halls, churches, schools, banks, stadi- ums and open-air theaters and other buildings. All work in con- nection with the installation, erection and/or application of all materials and component parts of walls and partitions regardless of their material composition or method or manner of their instal- lation attachment or connection, including, but not limited to the following items; all floor and ceiling runners, studs, stiffeners, cross bracings, fireblocking, resilient channels, furring channels, doors and windows including frames, casings, mouldings, bases, accessory trim items, gypsum or drywall materials, lami- nated gypsum systems, backing boards, finish boards, fireproof- ing of beams and columns, fireproofing of chase, sound and thermal insulation materials, fixture attachments including all layout work, preparation of all openings for lighting, air vents, or other purposes; and all other necessary or related work in con- nection therewith. Resilient floor covering, carpetlaying and alu- minum siding application, consists of the cutting, laying, taking up, fitting and relaying of all carpets, patent back carpets, linoleum, wall linoleum, wall tile, mattings, and all other pre- formed resilient floor or wall covering in sheet or roll form, hand and track machine sewing, drilling holes where necessary, installation of dowels and slats, brass and zinc trimmings, and all other fastenings for attaching carpets and linoleum, and the installation of all linoleum used for sinktops, tabletops, etc. Drapery, shades, and venetian blinds consists of the handling, fitting, measuring, and installation of fixtures and hardware for same. Aluminum siding work, coming under the jurisdiction of aluminum and composition siding, including soffits, fascias, gut- tering and down spouts, all wood blocked flooring such as used in Commercial and Industrial. The handling and unloading of materials related to all divisions and subdivisions of the trade regardless of distance carried. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the trade, including all work jurisdiction formerly claimed by the Lather's

International Union, and all work formerly claimed by the Tile, Marble, Terrazzo Finishers, Shopworkers and Granite Cutters International Union.

## Section 7. FLOOR COVERING SCOPE OF WORK.

The installation in all buildings, houses, apartments. To consist of installation, preparation, measuring, cutting, fitting, taking up and relaying of all carpets, rugs of all types, synthetic and natural fibers, woods, resilient floor coverings, linoleum, asphalt, rubber, vinyl, vinyl backed, cork, vinyl composition, no matter what combinations.

This shall include the preparation of all surfaces, sanding, leveling, priming, sealing, minor patching and finish sweeping and clean up duties.

Regardless of method of installation, this shall include all floors, interior and exterior, walls, countertops and bases, sink bases, as long as material and methods are the same. Shall also include all attaching of trim devices, whether wood, vinyl, metal or other type related to installation of material. This shall include the handling and unloading of materials related to all divisions/subdivisions of the trade, regardless of the distance carried. This shall also include the final sweep of the floor before installation, the vacuuming of carpets after installation, the first mopping and waxing of all vinyl composition products and the removal of all scrap material to a common location.

## Section 8.

The above occupational scope shall be subject to all Agreements of International Unions, including the use of Forklift and related equipment as tools of our trade.

## MILLWRIGHT LOCAL UNION #1051

## Section 9.    Millwright    Occupational    Scope.

This Agreement covers all Millwright work including, but not limited to the following: power rigging and installation of all engine motors, dynamos, generators, turbines, printing presses, conveyors, dryers, air compressors, fans, blowers, pumps, extruders, paper making machines, ball mills, roller mills, hammer mills, elevators, escalators, manlifts, bottling-canning factory equipment or any other mechanical device and installation of flywheels, sheaves, pulleys, or drivers on same. The rebabbitting of all machinery, all cutting, burning, and fabricating of all supports connected therewith. The installation of all laundry, kitchen and restaurant equipment. The repairing of all hand trucks, overhead chain conveyors, and power driven conveyors. (Description of one type of conveyor: a conveyor is a machine which, after

assembled, will perform work the same as any other mechanical machine or equipment). All fabrication, installation, dismantling and maintaining of all conveyors, including crew, belt, bucket, roller and slate, spiral chutes and all channel type free trolley I-beams and all types of monorails and tram rails, including conveyors built of wood, steel, pipe, or fibre, riveted, bolted, welded and all supports and adjuncts connected therewith. All fabrication, installation, dismantling and maintaining of all chain-type, dragline, air-veyor, power-driven, pipe constructed conveyors including all other supports and adjuncts necessary for their installation. All grain handling devices, all scales, all grain mills, crushers and beaters. All drives such as rope belt, chain, friction, gears and raw hide. All driver screens, dodge belts and gears, extractors and expellers, all agitators, barrel hooping machines, sewing machines and case sealing machines. Setting and maintaining of all portable mixers, the making, setting, drilling and pouring of all bolts for the installation of machinery and equipment. All coal handling machinery, drive crushers and conveyors of steel or wood, pile or fibre. Framing and setting of all bridge trees of wood, all foundation beams or timbers used for the reception of machinery. The handling of all hand and power rigging. The erection of all derricks to be used by millwrights and the installation and dismantling of machinery in floor, cereal, cotton, wool, twine, paper, steel, saw, cement, power house, sugar refineries, fertilizing plants, ice plants, breweries, distilleries, grain elevators, feed mills and other factories where shafting and machinery is used and any other work where millwright tools are used. The installation of recreational equipment in connection with bowling alleys such as pin-setters and related equipment in its entirety. The handling of all handpower rigging and cribbing required to unload, transfer, assemble, disassemble and set machinery, equipment and its adjuncts. The installation of all rigging beams whether they be temporary or permanent. Pile driving and the handling of all diving equipment and diving. The installation of all air-veyors, cable draglines and its guides, all hydraulic cylinders and linkage whether they be operated by air, oil or electricity. Transfer cars and its rails for heat treat or similar furnace. The installation of all x-ray equipment. The fabrication and erection of all scaffolding required for the installation of machinery and equipment. The fabrication, setting and dirpacking of all shims, sole plates, and machine bases, whether they are steel, wood or fibre for the installation of machinery, equipment, and its adjuncts. The installation of all precision setting of atomic reactor intervals. The installation of all dam rollers in its entirety and its adjuncts. The rigging and installation of comminutor, farminutor, degreaser, rotometer, dehumidifier,

benches, control panels, washers, anvils, welding equipment, shelving, hydraulic units, furnaces, utility sheds, refrigerators, stoves, deep freezes, pipe threaders, paint booths, gauge test, shroud boxes, scald machines, disintegrator, dehairing machine, filter presses, rotary filters, and the installation of stunning pens and doors, live bottom hoppers and the installation of two tripe will be performed by Millwrights. The power rigging and installation of paper, steel, plastic and aluminum rolling mills and related equipment. The installation of pre-engineered buildings regardless of material. Installation and fabrication of machinery and conveyor bases, headers and hangers. The installation of cooling towers regardless of type. Installation, fabrication, and welding of plastic materials. The power rigging and installation of sewage disposal systems, pollution equipment, bakery equipment, meat processing equipment, rendering equipment, laboratory equipment, pallet racks, storage bins, food dispensing equipment, dock boards and hoods, supermarket warehouse equipment, and scrapping out of machinery and its related equipment. The running in of all machinery; the covering, making and installation of all skids for machinery regardless if they are wood, steel or fibre and removing of same; the erection and fabrication of all pallet racks; the installation of gym equipment such as basketball back stops, installation of all load cells, eddy current clutches, bindicators and magnetic separators regardless of type; the installation of floor rails regardless of type, and the installation of rails for transfer cars, gantry and overhead cranes regardless of size or type; and installation of all material handling conveyors whether they be temporary or permanent; the handling of all optical tooling equipment, transits, laser and precision instruments for the setting of machinery; the installing of anchor bolts, cinch anchors, self tapping anchors and any device for the securing of machinery and its adjuncts; the forming, mixing of grout, grouting and dripacking of all machinery; the installation of machinery foundations; the installation of rotary valves, slide valves, (mechanical or hand operated) chutes and spouts regardless of gauge; and the steam cleaning of all machinery; the handling, cleaning by any means, erecting, installing and dismantling of all machinery and equipment; the installation of escalators, elevators, shoe cleaning machines and traveling walkways, jet or rocket powered machinery; all handling, setting and machining of all sole plates regardless of what they support; all drilling, tapping and welding that may be required; lubrication of all equipment and machinery is the work of millwrights; any exterior forms of the containment vessel; the complete setting and leveling by any means of the ring girder or bases plus any necessary cleaning, scraping or machining; all

apertures or openings; including access door frames, etc., in the containment vessel will be rigged, placed, aligned and secured by any means by millwrights; the placing, leveling and aligning of the reactor vessel, including the use of optical instruments, laser or maser beams; the installation and securing of biological shield interior plates; exterior plates and or forms for biological shields where a void is poured with concrete shall be considered a form and shall be placed and secured in it's entirety by millwrights; the precision alignment and leveling, including bolting and cleaning, scraping or machining and the measuring and torquing of bolts; installation of the rod pressure housing, push rods and drives, shut-down rods and drives and guide sleeves; the field welding in conjunction with the control rod drive housing will be performed by millwrights. The wiring of core starters, core winders, or any similar work on machinery. The handling and installation of vibratory conveyor, neutralizer, shadow drafts, extruders, dehumidifiers, testing equipment, laboratory equipment, refrigerators, and dynamometers will be performed by millwrights. The set up and operation of all machine tools on the job site whether they be portable or stationary, such as lathes, milling machines, shapers, saws, grinders, etc., used for the setting and fitting of any equipment. The setting, welding and installation of the supporting steel for the control rod drives. The handling and installation of the supporting steel for the control rod drives. The handling and installation of lubricators and the lubrication bly of ladle cars. The installation of all cribbing. The assembly of all machinery and equipment. The installation and handling of all garage equipment including hoists, wash racks and aligning equipment. The rigging and setting and installation of all stage equipment, stage lifts, background equipment, curtains, cables, shives, hydraulic devices and all other related stage equipment installed in art buildings, theatrical buildings and music buildings. The rigging, setting, fabrication, relabrication, welding, bolting and installation of bin activators. The mixing, rodding and placing of all cement base materials, grout, por-rok or any other material or substance used for pumps, compressors, machinery, conveyors or any other equipment and related equipment that is installed by millwrights. The installation, rigging and setting of all dental chairs and related dental equipment. The installation of all conveyor systems in banks or savings and loan associations, regardless of trade names or method of operation of conveyors. The rigging and installation of all cylinders air or hydraulic regardless of their function. All start up and run in crews for flushing of lubricating systems, filters and reservoirs. Lubricating systems and filters, before and after initial starting of pumps, compressors, machinery and equipment

to be served shall be cleaned by Millwrights. All cleaning of reservoirs and filling by any means of reservoirs. Control of all equipment used for purpose of heating and/or cooling the oil flowing through lubricating systems. All rails regardless whether carrying mechanical activated equipment or not and the installation of all standard railroad track. The installation of all mail handling and postal equipment, chute spouts, conveyors and rigging fabrication welding refabrication of same. The unloading, installation of Z-loaders, palletizers and Triax Equipment. Operation of vehicles to transport personnel. The installation of pipe organs in their entirety. Clean up of the area in which they are working in. Installation of manipulator balancers and all related equipment. Including the use of forklift and related equipment as tools of our trade.

This contract shall apply to all subdivisions of the trade in its entirety and without limitation. There are special provisions within this Contract dealing with one subdivision of the trade or another and such special provision when clearly identified as being limited to the specific subdivision shall be so limited. Absent such limitation, this Contract will apply in its entirety to all subdivisions of the trade and whenever the term "Carpenter" or "Joiner" is used, it shall mean all subdivisions of the trade.

**Section 10.** The parties understand that it is an impossible task to spell out in complete detail the work of the bargaining unit. Accordingly, even though specific work may not be specifically spelled out above it will nevertheless be considered as and treated as part of bargaining unit work if it is traditional work of the Carpenters.

**Section 11.** The Union agrees that the above occupational scopes are not intended to conflict with established practices, International Agreements or jurisdictional awards approved by the Building and Construction Trades Department, AFL-CIO (blue book decisions attested to by the Chairman).

## PILEDRIVERS

**Section 12. Piledrivers Occupational Scope.** This Agreement recognizes that the Union jurisdiction of the work performed on all pile driving and removal operations, the driving of wood pile and removal and the cutting, heading and the pointing of same, including the driving of all steel piling, including pipe sheeting, H-beams, I-beams, and caissons; the driving of concrete pile, precast or cast in place; the driving of all composite pile, the driving of cofferdams, the installation and removal of all bracing and walers; the erection of all trestles, false work and docks; the job site erecting and dismanting of derricks, A-

-10-

frames, cranes and gin poles, when used in conjunction with pile driving work, the cribbing, shoring and under pinning of buildings when pile driving is involved; the erection, dismantling and jacking of pile load tests; the loading, unloading and distribution of all piling; the maintenance of pile driving equipment, all burning, welding and splicing of piling, including welding of all end plates and bearing plates prior to driving and after installation of all piling, except for mill fabrication and manufacturing. The operation of all valves, including the pulling of rope or cable to trip the hammer, used in conjunction with pile driving operations, except when installed in the cab on a piledriving rig. The job site preparation of all barges and scows to be used in pile driving work; crane signaling pertaining to all pile driving work; all other work hereafter awarded as tools of our trade. Including the use of forklift and related equipment as tools of our trade.

This Agreement recognizes the Union jurisdiction on pile driving and removal of piling. A safe crew shall be used on all pile driving and removal but in no case shall be less than four (4) journeymen and one (1) foreman on bearing pile and no less than four (4) journeymen and one (1) foreman on sheet piling when leads are to be involved. However, when hand held or hydraulic or air assisted equipment is to be used without leads, a crew shall consist of no less than two (2) journeymen and one (1) foreman.

**Section 13. Lathers Scope of Work.** Erecting, constructing, installing, and completing all light iron, construction, furring, making and erecting of brackets, clips and hangers; and installation of all wood, wire and metal lath; plaster board or other material which takes the place of same to which plastic or acoustical material is adhered; corner beads, all floor construction; arches erected for the purpose of holding plaster, cement, concrete or any other plastic or acoustical material.

All carrying bars, perlins and furring, regardless of size; light iron and metal furring of all descriptions such as rods, channels, flat iron, nailock, screwlock, pomeroy, T-bar, H-bar, Z-bar, metal splines and other ceiling bars or systems for the receipt of metal lath, rock lath, gypsum board, acoustical tile or any other materials and all light iron and metal studs such as Stran Steel, Penn Metal, Soule, Truscon or other trade names of metal studs and all other types of light iron or metal studs, no matter what the manufacturer, when such studs are to receive a dry wall finish, such as gypsum board, wall board, wooden paneling, etc., or when such studs are to receive metal lath, rock lath, or other material or the application of plaster or other sprayed on wet

-11-

material; and all other light iron furring erected to receive lath and plastic or acoustical materials.

The typing, nailing and fastening of all wire and metallic lath such as wirecloth, wire mesh, expanded metal lath, Hyrib lath and all rib and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers and all inserts used for the purpose of supporting suspended ceilings of any of the above types of light iron and metal furring which receives lath and plaster or acoustical materials; the placing of all types of floor lath, such as hyrib lath, paperback steellex floor lath, Penn metal rib and all other appurtenances connected herewith.

The typing, nailing, clipping or fastening of all types of lath, regardless of size, such as wood lath, plaster board, button board, flaxlinum board, bishipric celotex, gypsum lath, rock lath, sheetrock or any and all other types of material erected to receive or hold plaster or acoustical material.

The erection of all metal plastering accessories such as metal corner beads, door and window casing beads, metal picture mould, metal chair rail, metal base and base screed and any and all other metal plastering accessories which are covered and/or serve as a ground, guard or screed for plaster material.

The handling on the job site of all materials or materials falling within the trade jurisdiction of the Lathers from the site of delivery on the job to the point of the job where work is to be performed with said materials.

The work of the fabrication of all materials on a job shall be assigned to journeymen, lathers and apprentices. Including the use of forklift and related equipment as tools of our trade.

**Section 14.   Tile,   Marble,   Terrazzo,   Finishers, Shopworkers and Granite Cutters Scope of Work.** This International Union has jurisdiction in the following work and such other work as it may hereinafter acquire.

The trade or work jurisdiction of this International Union, which includes all work recited in the original charter of the International Association of Marble Workers granted from the American Federation of Labor on January 11, 1902, in addition to all work included in a new charter issued to the International Association of Marble, Slate and Stone Polishers, Rubbers and Sawyers on February 2, 1917, in addition to all work included in a new charter issued to the International Association of Marble, Slate and Stone Polishers, Rubbers and Sawyers, Tile and

Marble Setters Helpers on July 21, 1921, in addition to all work included in a new charter issued to the International Association of Marble, Slate and Stone Polishers, Rubbers and Sawyers, Tile and Marble Setters Helpers and Marble Mosaic and Terrazzo Workers Helpers on May 25, 1931, in addition to all work included in the original charter of the International Association of Granite Cutters granted by the decisions of the American Federation of Labor on November 15, 1881, and all work granted by the decisions of the American Federation of Labor and its affiliated departments and as a result of decisions of public and private tribunals and as a result of trade or area practice or as a result of organization and Collective Bargaining Agreements as historically and traditionally exercised by the International Union and as outlined in this Article and declared and promulgated by the General Executive Council.

Its polishers and rubbers shall polish, rub and clean all marble, stone, slate and glass, and all compositions and imitations that require the same process of finishing required in polishing, rubbing and cleaning marble, stone or slate; this work applies to shop and building, hand and machine.

Sawyers shall run all gang, cable and diamond saws, set all blocks in gangs, and hammer and set all saws.

Marble Finishers Work—shall include but not be limited to, all utility work, such as loading and unloading trucks and shop machines, operating cranes and derricks, performing all rigging, the handling of all materials that may be needed for the installation of such materials, and such work that has historically and traditionally been the work of the Marble Finisher.

Tile Finishers work—shall include but not be limited to all cleaning, grouting and polishing of all tile, handling all sand, cement, lime, tile and all other similar materials that may be used in the installation, repair and maintenance of tile and/or similar materials. Finishers shall fill all joints and voids regardless of method on all tile work, particularly and especially after installation of said tile work. Tile Finishers shall also apply any and all protective coverings to all types of tile installations. These types of protective coverings will include but not be limited to all soap compounds, all types of paper products, all types of varnishes and lacquers, all types of tapes and all polyethylene coverings, including all new types of products that may be used for the protection of the tile installation.

The work performed by Terrazzo Finishers shall include, but not be limited to, all handling of sand, cement, lime, terrazzo and all other materials that may be used in the installation of terraz-

zo and all similar materials, the distribution by hand or by use of any power driven equipment of the above material. Rubbing, grinding and cleaning, polishing and sealing Marble, Mosaic and Terrazzo floors and wainscoting, curbs, steps and base, including but not limited to, Magnesite terrazzo, Dex-o-tex terrazzo, epoxy matrix terrazzo, aggregate, rustic or rough washed for exterior or interior of buildings placed either by machine or by hand and any other kind of mixtures of plastics composed of chips or granules of marble, granite, blue stone enamel, mother of pearl, quartz, ceramic colored quartz and rubber, neoprene, vinyl, magnesium chloride or any other resinous or chemical substances used for seamless flooring systems, or any substances therefore when run on the building by hand or machine, any new method of installation such as caulking and sealing with all new terrazzo material, also acid etching of new or old surfaces, also all priming for installation of new materials in the installation of the above materials, including the use of Forkift and related equipment as tools of our trade.

Machine Stone Workers, Rubbers and Helpers are limited to work on cut cast stone and artificial stone used for exterior and construction. The work on artificial stone consists of all sawing, bed and hand rubbing, operating of cranes, tool grinding and the handling to the shipping point. The work on cut cast stone consists of all moulding, mixing, pouring and rubbing and handling to the shipping point and tool grinding.

The Cemetery Stone Handlers, Erectors and Granite Helpers include crane and derrick operators, hook-up men, drillers, yard and shop helpers, bed setters' helpers, sawyers' helpers, erectors, drivers, erectors 'helpers, who handle stone in the granite cutting yards and cemeteries.

Granite Cutters and Polishers' work—shall include but not be limited to all work in the granite industry such as cutting, carving, dressing, drafting, lettering, sandblasting, sawing and setting all granite (natural and artificial, interior and exterior) bluestone and hard stone on which granite cutters' tools are used. This includes from the roughest of street work, seam face and rockfaced ashlar, to the finest of moulded work, carving, statuary, machine cutting, turning, rubbing, polishing or dressing, all lettering (hand marked and "Space Write" wherever possible), sandblasting, including work of preparing and placing of composition necessary, sawing and setting of any kind of granite (natural and artificial), bluestone, and other hard stone, on which granite cutting tools or machines are used. Including flame burning torches and guillotines and making up, sharpening or dressing said tools either by hand or machine; all designing, drafting, making pat-

terns, shop cards, diagrams used in connection with the granite industry; also all jointing of bluestone in building work, street work, flagging or any other work in which bluestone is used and all other workers connected with the granite industry.

The International Union shall have the authority to establish additional general or special categories of work jurisdiction as may be required from time to time to identify and maintain the skills coming within the work jurisdiction of the International Union.

The Employer and the Union shall have the right, by mutual agreement, to add to the work jurisdiction as above defined and set forth and such addition to the work jurisdiction shall be binding upon the parties.

The parties understand that it is an impossible task to spell out in complete detail the work of the bargaining unit. Accordingly, even though specific work may not be specifically spelled out, it will nevertheless be considered as and treated as part of the bargaining unit work if it is traditional work of the Carpenters. The Union agrees that the above occupational scopes are not intended to conflict with established practices, International Agreements or Jurisdictional Awards approved by the Building and Construction Trades Department, AFL-CIO Blue Book Decisions attested to by the Chairman.

**Section 15. Performance of Work by Employees In Bargaining Unit:** The Employees in the bargaining unit and only such Employees shall perform all of the work covered by this Agreement, in accordance with Article VIII of this Agreement.

**ARTICLE III**
**MANAGEMENT RIGHTS**

**Section 1.** The Employer retains full and exclusive authority for the management of its operations. The Employer shall direct his working forces at his sole prerogative, including, but not limited to hiring, promotion, overtime assignments, layoff or discharge.

**Section 2.** There shall be no limit on production by Employees nor restrictions on the full use of tools or equipment. Employees shall use such tools as required to perform any of the work of the trade. The operation of all equipment shall be assigned to the proper craft jurisdiction.

**Section 3.** No rules, customs or practices shall be permitted or observed which limit or restrict production, or limit or restrict the working effort of Employees. The Employer shall

determine the most efficient method or techniques of construction, tools or other labor-saving devices to be used. However, safety of the Employees on the job site shall be of prime concern to the Employer. There shall be no limitations upon the choice of materials or design. The Employer shall schedule work and shall determine when overtime will be worked.

**Section 4.** The Employer shall determine the recording devices, checking systems, brassing or other methods of keeping time records.

**Section 5.** The foregoing enumeration of management rights shall be deemed to be inclusive not exclusive. The Employer retains all management rights except as expressly limited herein or by locally negotiated Agreements to the extent Local Agreements do not conflict with the terms and provisions of this Agreement.

## ARTICLE IV
## RECOGNITION

**Section 1.** The Employer recognizes the Union as the exclusive representative and bargaining agent for all Carpenter Employees performing work properly coming under the jurisdiction of the United Brotherhood of Carpenters and Joiners of America as defined in its trade autonomy.

**Section 2.** The Union recognizes that the Contractor is the Employer of the Union member as Employees. If a Union member performs contractor work, then he shall be deemed to be a Contractor and shall sign a contract with the Mid-Central Illinois Regional Council of Carpenters.

## ARTICLE V
## UNION SECURITY

**Section 1.** All bargaining unit employees covered by this Agreement as a condition of their continued employment, shall, commencing on the eighth (8th) day following the beginning of their employment or the effective date of this Agreement, whichever is the latter, acquire and maintain membership in the Union. Failure of an Employee to comply with the provision of this Article shall upon written request of the Union, result in the termination of such Employee. The Employer shall not justify any discrimination against an Employee for non-membership in the Union if:

(A) he has reasonable grounds for believing that such membership was not available to the Employee on the same terms and conditions generally applicable to the other members or,

–16–

(B) he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the Employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

## ARTICLE VI
## UNION REPRESENTATION

**Section 1.** A Steward shall be a working journeyman, receiving journeyman pay, appointed by the Business Manager or Business Agent of the Local Union having jurisdiction. The Business Manager or Business Agent shall notify the Employer's Representative who he has selected as Steward immediately following such selection.

**Section 2.** A Steward shall not be laid off or discharged as long as other members of his craft are employed by the Employer, with the exception of one (1) foreman, without just cause.

**Section 3.** Designated representatives of the Union shall not be denied access to the Employer's project office or to any portion of the Employers project for the transaction of necessary business with the Employer or the members of the Union subject to government or security regulations.

**Section 4.** The Employer agrees to recognize the right of the Business Representative to select a Steward from among the Employees, to herein attempt to adjust disputes and grievances, and in case of accident, to see that the Employee and their personal belongings are cared for. Loss of time by the injured Employee or the Steward in caring for sick or injured Employees shall be paid for by the Employer, during the scheduled working shift, in an amount not to exceed eight (8) hours.

**Section 5.** It is understood and agreed that the Steward must have been a member of the Union in whose jurisdiction the Employer is working for a period of at least one (1) year, except by permission of the Business Representative where conditions justify. The Steward, or his appointed substitute, shall work on all overtime work providing they are qualified to do the work.

**Section 6.** A Steward, after having satisfactorily completed five (5) working days of employment for the Employer shall not be laid off or discharged so long as other UBC members are employed by the Employer, without just cause. In no case shall the Steward be discharged, laid off or fired until the Business Representative or Assistant Business Representative has been notified to the effect that his work or conduct is unsatisfactory. If,

–17–

after a thorough investigation, it can be proven that the Steward is incompetent or insubordinate then he shall be discharged and the Business Representative or Assistant Business Representative shall appoint another Steward. When the Employer's work force is temporarily cut down with only a Foreman remaining on the job and the Steward is laid off, when rehiring, the Steward, if available, shall be the first man re-employed, providing he is qualified to perform the work.

**Section 7.** In no instance shall the Steward be discriminated against because of his affiliation with the Union or because of his activities on behalf of the Union.

## ARTICLE VII
## PRE-JOB CONFERENCE

**Section 1.** No Employer covered by this Agreement shall commence a job until the pre-job conference has been held. Such pre-job conference shall be held not less than forty eight (48) hours before a job commences. However, if the parties agree, the pre-job conference may be done by fax, phone, electronic communications, or in person.

**Section 2.** At the pre-job conference, the Employer shall advise the Local Union of its requirements as to the workmen required in the respective classifications, the probable starting date, duration of the job, the working schedules and shall be required to submit in writing the names, address, telephone number and the contact person of all subcontractors performing bargaining unit work under this contract when available.

**Section 3.** The above section will not apply providing the job continues not more than five (5) working days. It is agreed that a contractor working within the jurisdiction of the Local Unions, parties of this Agreement, shall notify the Business Manager before starting this work.

## ARTICLE VIII
## HIRING

**Section 1.** On each jobsite the Employer may employ one key person who may be the first man on the job, from any area. This Employee may be designated by the Employer to be a Foreman or a General Foreman.

**Section 2.** The Employer may at any time recall by name from the out of work list of the Local Union having jurisdiction, employees who have special skills or previous work experience with the Employer within the preceding twelve (12) months.

**Section 3.** All other applicants for employment in the var-

-18-

ious classifications required by the Employer shall be referred to the Employer by the Union except as otherwise provided herein.

**Section 4.** The Employer shall be the sole judge of the competency and qualification of individuals referred by the Union and the number of Employees required at any time. No manning clauses shall apply unless specified in this Agreement.

**Section 5.** There shall be no restriction on the movement of Employees between jobs of the Employer within the jurisdiction of a Local Union.

**Section 6.** When a job falls within the jurisdiction of two (2) or more Local Unions, the Local Unions involved shall promptly determine a formula for jointly manning the job.

**Section 7.** The Employer shall have free movement of regular UBC Member Employees within the jurisdiction of the Mid-Central Illinois Regional Council of Carpenters with at least one (1) of the workmen referred from the Local Union, whose jurisdiction that jobsite is located in, who shall be Steward, unless Employees are not available from the Local Union. It is understood that the provisions of Article VI, Union Representation, shall apply. In order to be considered a regular employee, the employee shall have worked more than forty (40) hours for the Employer in the previous ninety (90) days. On all jobs requiring more than four (4) employees, the fifth (5th) and tenth (10th) employee shall be from the Local Union having jurisdiction over the geographic area of the job until a full crew of twelve (12) employees is reached. In the event the job requires a second crew, the Local Union having jurisdiction over the geographic area of the job shall furnish the first employee and the Employer the second alternating in this manner for the remainder of all needed employees on the job.

It is understood that for the purposes of Article VIII, Section 7, current and regular employees of the employer from the Local having jurisdiction over the job shall be counted as the fifth (5th) and tenth (10th) employee.

The Employer shall have free movement of Local #1051 men within the forty-one (41) county jurisdiction of Millwright Local Union #1051, affiliated with the Mid-Central Illinois Regional Council of Carpenters.

**Section 8.** The parties further recognize the provisions of the Civil Rights Act of 1964, the Age Discrimination Employment Act, the National Labor Relations Act, Executive Order 11346 and any Affirmative Action Programs of the parties.

-19-

**Section 9. Legal Authorization.** The Employer is exclusively engaged in the building and construction industry and the parties have elected to come under the provisions of Section 8(f), Part 3 of the National Labor Relations Act, as amended, which permits the parties to make an Agreement requiring the Employer to:

(A) Notify the Local Union of opportunities for employment provided, however, that the Employer reserves the right of recall of former Employees who have within the previous twelve (12) months performed work under this Agreement by notifying the Union.

(B) Give the Local Union an opportunity to refer qualified applicants for employment.

(C) The Employer shall advise the Local Union of all available job openings and job requirements at least forty-eight (48) hours excluding Saturday and Sunday prior to the Employer's fulfilling such job requirements.

(D) Men so referred shall not be given preference of priority by the Employer over non-referred men and the Employer shall have the sole and exclusive right of accepting or rejecting the men so referred.

(E) Whenever any words are used in the masculine gender in this contract, they shall be construed as though they were also used in the feminine gender.

(F) All present Employees who are members of the Union on the effective date of this Agreement shall be required to remain members of the Union as a condition of their employment.

Any Employee who fails to become a member of the Union or fails to maintain his membership therein in accordance with provisions of this Article shall forfeit his rights of employment and the Employer shall within two (2) working days of being notified by the Union in writing as to the failure of an Employee to join the Union or maintain his membership therein, discharge such Employee. For this purpose the requirements of membership and maintaining membership shall be consistent with State and Federal Laws. The Employer shall not be deemed in default unless he fails to act within the required period after receipt of registered or certified written notice.

(G) **Repeal and Greater Security.** In case of repeal or amendment of the Labor Management Relations Act of 1947, or in case of new legislation rendering permissible any Union security to the Union greater than that specified in this paragraph of

this Agreement, then, and in such event, such provisions shall automatically be deemed substituted in lieu thereof. In such event, and if permissible under law, the Union agrees to supply adequate, competent and qualified Employees for the job requirements of the Employer in the classifications covered by this Agreement.

(H) After the Employer has advised the Local Union of all available openings and job requirements at least forty-eight (48) hours excluding Saturday and Sunday prior to the Employer's needs, upon failure of Union to refer such needs adequately the Employer is free to hire from any source whatsoever.

(I) A Contractor, who employs Carpenter members, who are not members of Millwright Local Union #1051, has the right to use that member on existing Millwright work, if additional personnel in the Millwright trade is needed, the referrals shall come from Millwright Local #1051.

A Contractor who employs Millwright members, who are not members of the Local Carpenters Union in the Area, has the right to use that member on existing Carpenter work, if additional personnel in the Carpenter trade is needed, the referrals shall come from the Local Carpenter Union in the Area.

## ARTICLE IX
## FOREMAN, GENERAL FOREMAN, WORKING FOREMAN

**Section 1.** When three (3) or more Employees in the bargaining unit are working on the same job site, one (1) bargaining unit Employee shall be designated by the Employer as Foreman. When there are twelve (12) or more bargaining unit Employees working at the job site, then the Foreman shall not be required to work with his own tools. Nor shall he be required to supervise more than eleven (11) employees.

**Section 2.** When additional crews are established at the job site then the first man shall be designated by the Employer as Foreman.

**Section 3.** **General Foreman.** When three (3) crews of bargaining unit employees are working on the same job site there shall be a General Foreman who shall be required only to give instructions to three (3) Foreman.

**Section 4.** **Working Foreman.**
(A.) Only Journeyman covered by this Agreement shall be eligible to be selected as Foreman when the contractor makes his decision that foremen are required to supervise the work.

(B). When the Contractor determines it to his best interest to assign a working foreman to layout the work to be accomplished by the Carpenter, Lather, or Millwright, he shall appoint at his discretion, the individual of his choice from among those he normally employs or has hired for the project, without interference by the Union, provided they are members of the bargaining unit.

(C). Additional working foremen may be required to supervise and/or direct further operations when the number of employees exceeds the abilities of the Job Superintendent or the first appointed working Foreman, therefore the Contractor shall have the latitude to appoint additional working Foremen in the numbers he feels is required to properly organize and progress his work without interference by the Union.

(D). On all shift work the Contractor shall have the latitude to request the Foreman or Foremen to start early or stay over after their regularly scheduled shift to advise the succeeding Foreman or supervisor of the project details, of which the Contractors agrees to pay the agreed to rate of pay for the overtime required and above his regular scheduled shift of eight (8) hours.

(E). Foreman and General Foreman giving instruction to Employees of the Bargaining Unit shall be Journeyman members of a Local Union affiliated with the Mid-Central Illinois Regional Council of Carpenters. This suparagraph may be waived by a Representative of the Union only.

(F). Working Foreman shall have no authority to, nor shall they exercise any of the functions customarily exercised by Supervisors as defined in the National Labor Relations Act, as amended; nor shall they in any way be deemed to be an Agent of the Union.

## ARTICLE X
## GENERAL CONDITIONS

Section 1. There shall be no restriction on the Employers sole and exclusive right under this Agreement to determine the size of the work force on any particular job or project, except as noted in Article II, Section 12. Nor shall there be any restriction on the Employers sole and exclusive right to man or not to man any equipment. There shall be no standby work demands.

Section 2. The parties reaffirm their policy of a fair day's work for a fair day's wage. Employees shall be at their place of work at the starting time and shall remain at their place of work until the quitting time. Scheduled quitting time shall include a reasonable time to clean up.

-22-

Section 3. There shall not be any organized coffee breaks, rest periods or other non-working time established during working hours. Employees may take individual thermos of coffee, or non-alcoholic refreshments to their assigned place of work and consume same as time and work schedule allow.

Section 4. When Employees leave the project of their own accord at other than the normal quitting time, it is their responsibility to notify their Supervisor.

Section 5. When an Employer, upon reasonable cause, considers it necessary to shut down a job to avoid the possible loss of human life, or because of an Emergency situation that could endanger the life or safety of an Employee, Employees will be compensated only for the actual time worked. In such an event, if the Employer requests the Employee to stand by, Employees will be compensated for the standby time at the applicable rate.

Section 6. Only upon reasonable cause shall Employees on the job submit to personal and/or vehicle inspection by the Employer. The job site steward shall be at all inspections along with Employer designee for any such inspections.

Section 7. Foreman and General Foremen shall take orders only from the designated Employer Representative.

Section 8. Within one (1) hour after starting time, sanitary drinking water and individual drinking cups shall be furnished by the Employer on each job. Ice water, or mechanically cooled water will be furnished from May 1 to September 30.

## ARTICLE XI
## HOURS OF WORK AND OVERTIME

Section 1. The regular work week will start on Monday and conclude on Friday. Eight (8) consecutive hours exclusive of one-half (1/2) hour lunch period between the fourth (4th) and fifth (5th) hour after the starting time, between six o'clock (6:00) a.m. and five o'clock (5:00) p.m. shall constitute a normal work day. Starting time for the work day may be changed within these hours by the Employer to take advantage of daylight hours, weather conditions, shift or traffic conditions. Notice of such change will be given forty-eight (48) hours in advance. All the Employees of an Employer on the job site shall have the same starting time except when other arrangements are mutually agreed to.

Section 2. All Employees who report for work at their scheduled starting time shall receive two (2) hours show up pay

-23-

except in the case of inclement weather. If requested by the Employer, Employees must remain on the job two (2) hours to earn show up pay.

Employees who start work are guaranteed four (4) hours pay unless work is curtailed because of inclement weather, or emergency conditions as set forth in Section 5 of Article X, in which case Employees shall be paid only for the actual hours worked.

After the first four (4) hours Employees will be paid only for actual time worked.

**Section 3.** All work performed by an Employee in excess of eight (8) hours in any one day, Monday through Friday, and all Saturday work shall be paid for at the rate of time and one-half (1 1/2) times the hourly rate. Sundays and Holidays shall be paid at the double time rate. After ten (10) hours in any one day, at the double time rate. After ten (10) hours in any one day, Employees shall receive one-half (1/2) hour lunch and an additional lunch every four (4) hours after that.

**Section 4.** 8-Hour Work Day-Monday through Friday only. In the event of a lost workday on account of inclement weather, Saturday may be a voluntary make up day by mutual agreement between the Business Representative and the Employer. Provided however, that employees shall receive premium pay when any other craft working on the job at that time receives premium pay from the Employer. There shall be no retaliation or discrimination towards employees that decline make up work.

**Section 5.** If an Employee is recalled to the job site after the completion of his regular work shift, he shall receive a minimum of four (4) hours overtime pay or overtime pay for actual hours worked if more than four (4) hours.

**Section 6.** By prior agreement between the Employer and the Regional Council or Local Union Business Manager, if a special shift is required by an Owner and if the Employer is required to perform work which cannot be performed during regular working hours, an Employee may work a special shift and shall receive eight (8) hours pay at the appropriate rate. Seven (7) hours work not including a one-half (1/2) hour lunch shall constitute a full shift. No Employees may work on a special shift if he has performed bargaining unit work that day during the regular working hours. The Employer's request for this special shift must include the starting date, the approximate number of men involved and the estimated conclusion date.

**Section 7.** When work is performed by Employees covered by this Agreement on that portion of a project that extends beyond the geographical jurisdiction of the Mid-Central Illinois

-24-

Regional Council of Carpenters into the geographical jurisdiction of another United Brotherhood of Carpenters Regional Council/Local Union, it is agreed that for all such work the employees covered hereunder will receive the other Regional Council/Local Union's hourly wage and fringe benefit rates, if they are higher than those provided in this Agreement.

**Section 8.** When Employees are required to work overtime beyond their regular shift they shall be allowed a one-half (1/2) hour supper period with pay for each additional four (4) hours worked. The supper period is to be taken at the same time as the majority of other Employees but the first such supper hour shall be taken not later than six-thirty (6:30) p.m. When work continues after the supper hour for some of the crafts all United Brotherhood of Carpenters Employees who worked up to the supper hour period shall be allowed the one half (1/2) hour with overtime pay.

**Section 9. Shift Work.** When so elected by the contractor, multiple shifts of at least three (3) consecutive days duration may be worked. When two (2) or three (3) shifts are worked, the first shift (day shift) shall be worked between the hours of eight o'clock (8:00) a.m. and four-thirty (4:30) p.m. Workmen on the day shift shall receive eight (8) hours pay at the regular hourly rate for eight (8) hours work.

The evening shift shall be worked between the hours of four-thirty (4:30) p.m. and twelve thirty (12:30) a.m. Employees on the evening shift shall receive eight (8) hours pay at the regular hourly rate for seven and one-half (7 1/2) hours work.

The night shift shall be worked between the hours of twelve-thirty (12:30) a.m. and eight o'clock (8:00) a.m. Employees on the night shift shall receive eight (8) hours pay at the regular hourly rate for seven (7) hours work.

If only two (2) shifts are to be worked, the Employer may regulate starting times of the two (2) shift operations to permit the maximum utilization of daylight hours.

A lunch period of thirty (30) minutes shall be allowed on each shift.

Shift clause shall apply on regular work week only, twelve-thirty (12:30) a.m. Monday through twelve-thirty (12:30) a.m. Saturday. All other work performed on Sunday or Holidays and all hours worked other than the regular shift hours shall be paid according to the overtime provisions in this Agreement.

There shall be no pyramiding of rates and double the straight time rate shall be the maximum compensation for any hours worked.

-25-

If other hours and conditions are to be observed with respect to shift work, they shall be by mutual consent of the Contractor involved and the Union Business Manager or Regional Council.

In the event that Employees are changed from one shift to another, there shall be eight (8) hours lapse between shifts otherwise overtime wage rate shall be applicable.

By prior agreement between the Employer and the Union Business Manager, if the Employer is required to perform work which cannot be performed during regular working hours an Employee(s) may work a special shift, limited to seven (7) hours work included lunch, and receive eight (8) hours pay for the seven (7) hours worked.

No Employee may work on a special shift if he has performed bargaining unit work that day during the regular working hours.

## ARTICLE XII
## OPTIONAL 4-10 HOUR WORK WEEK

**Section 1.** By mutual agreement between the Union and the Employer, a work week consisting of four (4) ten (10) hour days may be utilized on a project.

**Section 2.** The work day shall consist of ten (10) hours worked between the hours of six o'clock (6:00) a.m. and five thirty (5:30) p.m., including lunch.

**Section 3.** The work week shall consist of four (4) ten (10) hour days commencing at six o'clock (6:00) a.m. Monday and ending at five thirty (5:30) p.m. Thursday.

**Section 4.** All hours worked in excess of ten (10) hours per day, Monday through Thursday shall be paid at the rate of time and one-half (1 1/2) the regular rate of pay.

**Section 5.** In the event that weather conditions or other acceptable conditions to the Union prevent work from being performed on a regular work day, then Friday shall be considered a regular work day at the straight time rate of pay (only to attain forty (40) hours per week) provided however, that employees shall receive premium pay when any other craft working on the job at that time receives premium pay from the Employer. If Friday is worked as a regular work day, then any work performed on Saturday will be paid at the time and one-half (1 1/2) rate of pay.

**Section 6.** In the event that the regular four (4) ten (10) hour days are worked and an Employer wants to work Friday, then all hours worked on Friday shall be paid at the rate of one

and one half (1 1/2) the regular rate of pay. In such case, any time worked on Saturday shall be paid at the double time rate of pay.

**Section 7.** Sundays and Holidays shall be paid at the double time rate of pay.

**Section 8.** The Employer shall provide the Union with the starting date and the conclusion date so that it may be determined that such request is not for the purpose of circumventing the overtime provisions of this contract.

**section 9.** When Employees are required to work beyond ten (10) hours per day, they shall receive an additional lunch period.

## ARTICLE XIII
## WAGES, FRINGES AND PAYDAY

**Section 1.** Except as specifically set forth in subsequent sections of this Article, all Employers agree to be bound by the wages, fringe benefits, dues deducts, apprenticeship, training and other industry advancement funds, affecting Employees which have been negotiated and legally established pursuant to bonafide collective bargaining, the Employer will be presented with such evidence by the Union and the Employer will, subject to the provisions of the Agreement, conform his operation accordingly.

**Section 2.** No subsequent change in wages or working conditions in such area will become effective insofar as the Employer is concerned, except to the extent that any such change in wages or working conditions will be agreed upon and in accordance with the effective date agreed upon in negotiations between the Local Union having jurisdiction over the area and a recognized bargaining agent of the Employer(s) in such area and no conditions shall be imposed thereby other than those in force on local firms.

**Section 3.** New wages and fringes shall become applicable upon consummation of applicable local collective bargaining agreements. New working conditions shall apply provided they do not conflict with the terms and provisions of this Agreement.

**Section 4.** All fringe benefits shall be paid on hours for which work is performed, such as one and one half (1 & 1/2) times fringes shall be paid for all one and one half (1 & 1/2) overtime. Double rate fringes shall be paid for all double (2) rate overtime. Benefits paid at overtime rates shall be Pension, Annuity and Health and Welfare. All other check offs and deductions will be paid at straight time rate.

**Section 5.** The Union shall have the right to picket for non-payment of wages, fringes and/or other deducts from employee's check, after giving five (5) days notice to the Owner's Representative.

**Section 6.** Any Employee assigned to perform work that requires premium pay shall receive not less than four (4) hours premium pay in addition to his minimum wage rate for any work performed in the a.m., and not less than four (4) hours premium pay in addition to his minimum wage rate for any work performed in the p.m.

An Employee designated to work as top man on sheet piling or the man assigned to working the leads shall receive not less than fifty cents ($.50) per hour above the minimum wage rate.

**Section 7.** The regular payday shall be once a week on Friday or such other day as the Employer shall designate prior to the start of the job. When the regular payday is a Holiday, then the last work day before that Holiday shall be payday.

**Section 8.** Wages shall be payable before quitting time and are to be paid in cash or other legal tender. The weekly payroll shall end no earlier than the third work day prior to payday. Accompanying each payment of wages shall be a separate statement identifying the Employer by name and address, showing the total earnings, the amount and purpose of each deduction, number of hours and net earnings.

**Section 9.** If no work on payday, the pay check shall be available on job site, or other mutually agreeable location, not later than two (2) hours from the starting time.

**Section 10.** Employees who are laid off on a day that is not the regular pay day may claim their final paycheck in person on the next regular pay day or have it overnight mailed to the Local Union Hall. If mailed, the check shall be dated for the actual day of layoff. If the check is not at the respective Local Union Hall the following day (excluding Saturdays, Sundays and Holidays) the employee shall receive two (2) hours pay at the straight time rate for each day the check is late. When an employee quits of his own accord, he shall wait for the regular payday for his wages.

**Section 11.** If an Employee is made to wait beyond the time his wages are due, he shall be paid at the straight time rate for all the time he waits. Employee must wait on job site on which he/she is employed.

# ARTICLE XIV
# HOLIDAYS

**Section 1.** Only the following Holidays shall be observed: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Day after Thanksgiving in lieu of Veterans Day and Christmas Day. The above Holidays shall be observed according to National Law, where applicable. If a holiday is on a Sunday, then that holiday will be celebrated on the following Monday. If the holiday is on a Saturday, then the holiday will be celebrated on the preceding Friday.

**Section 2.** No work will be performed on Labor Day under any consideration, except in an extreme emergency and then only after consent is given by the Business Manager.

# ARTICLE XV
# SUBCONTRACTING

**Section 1.** The Employer agrees not to subcontract out any Carpenter work to be done at the site of construction, alteration, painting or repair of a building, structure or other work except to a person, firm or corporation signatory to this Agreement. The furnishing of materials, supplies or equipment and the delivery thereof shall in no case be considered as subcontracting.

**Section 2.** Subcontractors coming under this Agreement must show proper insurance and agree to pay fringe benefits as provided in this Collective Bargaining Agreement.

**Section 3.** This Article shall not apply to Owner designated Subcontractors. Further, the Contractor agrees to notify the Union of such designated Sub-contractors when he becomes aware of same.

**Section 4.** At the time of the pre-job conference the Local Area Business Manager will bring to the attention of the Employer the availability of materials and/or services in the area. The Employer will make an effort to use such materials or services if possible.

# ARTICLE XVI
# JURISDICTIONAL DISPUTES

**Section 1.** As used in this Agreement, the term "jurisdictional dispute" shall be defined as any dispute, difference or disagreement involving the assignment of particular work to one class or craft of Employees rather than to a different class or craft of Employees, regardless of that Employer's contractual

relationship to any other Employer, Contractor or Organization on the site.

**Section 2.** In the event of any dispute involving craft jurisdiction the Employer shall forthwith notify the appropriate Representatives of the craft involved of the existence of such dispute, and convene a meeting with such Representatives for the purpose of attempting to resolve such dispute among the affected parties.

**Section 3.** In the event the jurisdictional dispute is not settled, it shall be referred to the Jurisdictional Dispute Committee consisting of three (3) Employer Representatives, selected by the Association and three (3) Union Representatives, selected by the Regional Council. A Meeting of the committee shall be convened within ten (10) days upon proper notification to all Committee members through their respective Organizations. The determination of the Jurisdictional Dispute Committee by majority vote of those present shall be binding on all parties bound to this Agreement.

Should the Jurisdictional Dispute Committee be unable to resolve the matter, the Union, the Employer or the Association shall refer the matter to Immediate arbitration by so notifying the affected parties and utilizing the Arbitration Article of this Agreement.

**Section 4.** There shall be no stoppage of work or slow down by Employees or lockout by the Employer, during the implementation of the above procedure for the settlement of jurisdictional disputes between crafts.

**Section 5.** The Employer shall submit in writing when requested by the Union, information regarding past, current and future job assignments. The Employer shall comply with such request not later than three (3) working days.

**Section 6.** The Union agrees that it will not file suit over jurisdictional issues provided that the other craft party to the dispute agrees to same.

## ARTICLE XVII
## GRIEVANCE PROCEDURE

**Section 1.** It is specifically agreed that there shall be no strikes, lockouts or cessation or slowdown of work or picketing over any dispute over the application or interpretation of this Agreement and that all grievances and disputes, excluding jurisdictional disputes, shall be handled as herein provided, except as addressed within this Agreement in Article XXII, Section 7, Trust Agreements.

**Section 2.** Should any Employee or the Employer covered by this Agreement believe that he has been unjustly dealt with or that any provisions of this Agreement has been or is being violated, such grievance shall be handled in the following manner:

(A) The Employee or Employer shall immediately report such grievance to the Steward or Business Representative, as the case may be, who shall go with him to the superintendent or Employer's Representative on the job site and endeavor to have same adjusted.

(B) In the event such complaint or grievance cannot be satisfactorily settled in this manner, the matter shall then be submitted in writing, within twenty-four (24) hours, to the Business Representative of the Union or the Union's Representative and a Representative of the Employer, who shall be selected by the Employer to act on such grievance.

## ARBITRATION

**Section 1.** In the event such complaint or grievance shall not have been satisfactorily settled, the matter shall then be submitted to an Arbitration Committee of three (3) for final decision. This Committee shall be selected as follows:

One (1) member shall be selected by and representing the Union, one (1) member shall be selected by and representing the Employer, and these two (2) shall select a third impartial member who shall act as Chairman. This Committee shall hold hearings as expeditiously as possible, and render its decision in writing without undue delay (within five (5) days) and the decision of the Committee shall be final and binding on both parties. Should the Management Representative and the Union Representative on the Arbitration Committee fail to agree on a third impartial member, then the parties shall jointly request the Federal Mediation and Conciliation Service to submit a list of seven (7) recognized Arbitrators. From the list so submitted, the parties would then within five (5) working days after receipt thereof select the Arbitrator by the alternate rejection of a suggested name until one (1) remains, the person whose name so remains shall act as Arbitrator.

**Section 2.** The Arbitrator shall have no power to add to, detract from or in any way modify the terms and provisions of this Agreement.

**Section 3.** The Arbitrator named by the Union and the Arbitrator named by the Employer shall serve as such without compensation; necessary expenses of the hearing, including

any compensation for the third Arbitrator shall be shared equally by the parties hereto.

**Section 4.** It is distinctly understood that hours of labor, rates of pay and the use of the Union Label are not subject to Arbitration.

**Section 5.** Any and all disputes, stoppages, suspensions of work and any and all claims, demands or actions resulting therefrom or involved therein shall be settled and determined exclusively by the machinery provided for settlement of grievances, including final arbitration.

## ARTICLE XVIII
## NO STRIKE—NO LOCKOUT

**Section 1.** During the term of this Agreement there shall be no strikes, picketing, work stoppages, slow downs, sympathy strikes or other disruptive activity for any reason by the Union or by any Employee and there shall be no lockout by the Employer.

**Section 2.** Nothing in this Agreement shall be construed to limit or restrict the right of the Union or the Employer to pursue fully any and all remedies available under law in the event of a violation of this Article.

**Section 3.** Employees shall have the right within the limits set by Section 8(b) 4 of the National Labor Relations Act, as amended; and it shall not be a violation of this Agreement or any cause for discharge or any other penalty if an Employee or Employees (covered by this Agreement) refuse to go through an established picket line.

## ARTICLE XIX
## SAVINGS CLAUSE

**Section 1.** Should any part of or any provision herein contained be rendered or declared invalid by any reason of any existing or subsequently enacted legislation, or by any decree or order of a court or board of competent jurisdiction, such invalidation of such part or portion of Agreement shall not invalidate the remaining portion hereof; provided, however, upon such invalidation, the parties signatory hereto agree to immediately meet to renegotiate an article or provision which will meet the objections to this invalidity, and which will be in accord with the intent and purpose of the article or provision in question.

**Section 2.** The remaining part or provisions shall remain in full force and effect.

## ARTICLE XX
## MLCCI, T.E.A.M., TRICON

**Section 1.** The parties recognize the value to the community and to the Construction Industry of a joint Labor-Management Committee serving the Construction Industry. To this end the parties agree to participate in, support and, in part, fund the operation of the McLean and Livingston County Construction Council, Inc. (MLCCI). MLCCI contributions represent a joint and matching contribution on behalf of each Employer and each Employee of crafts signatory to this agreement. In the event that MLCCI contributions are discontinued, the existing wage scale shall be increased by an amount equal to half of the contribution rate at the time such contributions are discontinued.

**Section 2.** The parties recognize the value to the Community and to the Construction Industry of a joint Labor-Management Committee serving the Construction Industry. To this end the parties agree to participate in, support and, in part, fund the operation of the T.E.A.M. T.E.A.M. contributions represent a joint and matching contribution on behalf of each Employer and each Employee of crafts signatory to this Agreement. In the event that T.E.A.M. contributions are discontinued, the existing wage scale shall be increased by an amount equal to half of the contribution rate at the time such contributions are discontinued.

**Section 3.** The parties recognize the value to the Community and to the Construction Industry of a joint Labor-Management Committee serving the Construction Industry. To this end the parties agree to participate in, support and, in part, fund the operation of the Tri County Construction Labor-Management Council (TRICON). TRICON contributions represent a joint and matching contribution on behalf of each Employer and each Employee. In the event that TRICON contributions are discontinued, the existing wage scale shall be increased by an amount equal to half of the contribution rate at the time such contributions are discontinued.

**Section 4.** The contribution rates for the above Labor-Management Funds shall be paid as reflected on the appropriate area wage addendum.

## ARTICLE XXI
## APPRENTICES

**Section 1.** Upon an Employer having at least two (2) Employees of the Bargaining Unit in his employ, he may be

allowed one (1) Apprentice by the Joint Apprenticeship and Training Committee.

**Section 2.** Upon an Employer having three (3) Employees of the Bargaining Unit in his employ, he must, if available, work one (1) Apprentice and, thereafter, the Employer must work one (1) additional Apprentice for each additional three (3) Employees of Bargaining Unit employed. All Apprentices must be approved by the Joint Apprenticeship and Training Committee.

**Section 3.** Any Apprentice who should fail to comply with the Apprenticeship standards, the rules and regulations of the Joint Apprenticeship and Training Committee, or who fails to attend school as required, or perform on the job training satisfactorily, shall be given notice in detail in writing of the alleged violations by the Employer or the joint JATC prior to termination of employment. The Employer or the joint JATC agrees to extend this notice to the Employee and the Business Representative of the Local involved, upon receipt of the notice of alleged violation by registered or certified mail from the Joint Apprenticeship and Training Committee. An Employee so notified, if he believes that the facts upon which this violation is based are untrue, may challenge such facts by filing a written statement with the Local Union and the Employer within three (3) working days thereafter. A hearing shall be held within three (3) working days after the filing of such statement by the Apprentice before an equal number of Employer and Union Representatives, for the purpose of passing upon the claim of such individual. In the event of a disagreement between the Local Union and the Employer, the matter shall be deemed in dispute and submitted to Arbitration in accordance with the Arbitration Provisions of this Contract. If the Apprentice does not so file, he shall be discharged after the three (3) days have elapsed.

**Section 4.** No first year Apprentice shall be allowed to use any power tools, nor shall he be allowed to work on a hoist or tower except when such work is on the ground until he has received the proper safety instructions. Such instruction to be given in the first six (6) months of the training at Apprenticeship and Training School. In no case shall an Apprentice do any rigging until he has had one (1) year of training.

**Section 5.** Apprentices shall be paid wages according to the wage scale set forth in the current Addendum attached hereto or as set forth by the Joint Apprenticeship and Training Committee.

**Section 6.** There shall be a Master Apprentice Committee comprised of an equal number of Union and Employer Representatives who will be responsible for the Apprenticeship Programs in each of the affiliated Local Unions in the Regional Council.

**Section 7.** Apprenticeship Contribution will raise from twenty five cents ($.25) to thirty cents ($.30) for duration of agreement. If both parties agree that additional funds are needed for the Training Program, the contribution rates may be increased.

**Section 8. Carpenters International Training Fund and Carpenters Labor Management/Education/Development Fund.** In addition to any contributions otherwise called for herein, the parties agree that the Employer shall make a contribution of four cents ($.04) per hour worked for each Employee covered by this Agreement to the Carpenters International Training Fund. The parties also agree that the Employer shall make a contribution of two cents ($.02) per hour worked for each Employee covered by this Agreement to the Carpenters Labor Management/Education/Development Fund. Payment shall be made to the Carpenters International Training Fund and the Carpenters Labor Management/Education/Development Fund on or before the fifteenth (15th) day of the month following the month of the work performed. The Employer hereby agrees to be bound by the Agreements and Declarations of Trust for the Carpenters International Training Fund and the Carpenters Labor Management/Education/Development Fund as they exist and as they may be amended or restated, and to such rules, regulations and other governing documents adopted pursuant to such Trusts. Upon request, the Employer may receive the latest Annual Report prepared for the Carpenters Training Fund, and/or the Carpenters Labor Management/Education/Development Fund.

**Section 9. Training.** It is recognized that failure to provide training opportunities for Journeymen and Apprentices, and the failure of these individuals to take advantage of these opportunities stands as a impediment to the competitiveness of the area's unionized construction industry. It is also acknowledged that training will have a discernible, positive effect upon productivity and quality for the industry. It is further noted that verifiable training offers a strong marketing concept for Contractors, thereby enhancing employment opportunities for Union Labor. These concepts also promote pride and satisfaction in building tradesmen, which, in themselves, are marketable attributes.

Management and Labor therefore pledge to work towards the development of intensified, innovative training programs

designed to improve quality, safety and productivity in a competitive environment. To this end, the Unions may provide to Employers current lists of those tradesmen that successfully complete upgrade training programs so that they will be naturally rewarded through increased work opportunities for reinvesting in their collective futures.

It is further agreed that the Unions will provide to Management Associations specific information on the scope of any Journeyman upgrade training.

## ARTICLE XXII
## TRUST AGREEMENTS, ETC.

**Section 1.** The Employer agrees that Pension and Welfare Fund contributions under this Agreement are to be made to the Independent Employee Benefit Fund, Central Illinois Health & Welfare Fund, Construction Industry Welfare Fund of Central Illinois, and Danville Carpenters Health, Welfare and Pension Fund at the hourly rates specified elsewhere in this Agreement, and that such contributions are to be made on behalf of all persons covered by this Agreement for all hours worked by such persons for the Employers.

The Employer agrees to be bound by the terms of the Trust Agreements establishing the various above mentioned Funds, as they now exist and as they may hereafter be amended, as if the terms of such Agreements were fully set forth herein. The Employer understands and acknowledges that the Trustees of those Funds have the right to make reasonable rules relating to the administration of the Funds, including rules pertaining to the payment of fringe benefit contributions as specified in this Agreement, and pertaining to their rights and remedies as against Employers who are delinquent in making payment of such contributions to the Funds. The Employer agrees to be bound by such rules as currently exist or may from time to time be established or amended. Copies of such rules can be obtained by the Employer by request from the various Funds Administrator.

**Section 2. Supervisor Clause.** The bargaining unit shall also include, for purposes of Pension and Welfare Fund contributions only, such persons in the employ of the Employer referred to herein as "Supervisors," as that term is defined in the Labor-Management Relations Act of 1947, as amended, provided that such Supervisor:

(A) has heretofore been included as a member of the "bargaining unit" on any basis, under the terms of this Collective

Bargaining Agreement, any predecessor Collective Bargaining Agreement, or any other Collective Bargaining Agreement entered into by this Local Union or Regional Council, and

B) was an Employee on whose behalf within the five (5) year period prior to the effective date of this Agreement contributions were required to be made or were in fact made to any of the various Funds as specified above for at least five thousand (5,000) hours worked.

It is expressly understood that the purpose of this provision is limited solely to permitting persons who have participated in the aforesaid Pension and Welfare Funds as members of the Bargaining Unit to continue to do so upon their promotion to Management positions, and is in no respect intended to include such persons within the scope of the Bargaining Unit for purposes of Union membership, Collective Bargaining or any other provisions of this Agreement other than provisions governing the payment of Pension and Welfare contributions.

It is further understood and agreed that since such Supervisors are not subject to the wage provisions of this Agreement, and may be paid on a salaried basis, contributions on behalf of such persons to the Pension and Welfare fund shall be on the basis of one hundred sixty (160) hours for each and every month during which such Supervisor receives any wages from the Employer.

**Section 3. Language for Company Owners/Sole Proprietors that are not Incorporated.** Owners and/or Sole Proprietors engaged in the industry may participate in the Pension, Annuity, and Health and Welfare Funds provided, however, that the appropriate Agreements and Declarations of Trust and/or Administrative Rules of the appropriate Trusts specifically authorizes such participation. Each Owner/Sole Proprietor must execute the appropriate Agreements and Declaration of Trust and Administrative Rules of the appropriate Trusts adopted by the Trustees based on the number of hours actually worked. The Owner/Sole Proprietor must notify the Local Union in writing not less than thirty (30) days prior to the beginning of May 1st of each year as to whether or not each Owner/Sole Proprietor opts for said coverage and agrees to the terms and conditions of this Article and the Agreement and Declaration of Trust for the Fund. In the event that each Owner/Sole Proprietor opts for the coverage, it is specifically agreed and understood that such coverage shall continue for the duration of the current Collective Bargaining Agreement.

**Section 4. Forms, Payment Date and Audit Rights.** Forms to be supplied by the Trustees of the various Funds shall be completed by each Employer and the Employer shall trans-

mit the required amounts to the depository on or before the 15th day of each month for all contributions attributable to the prior calendar month. In the event the Trustees of any Fund or the Union question on the authenticity or accuracy of the information completed on the forms or in the event of a belief that the amounts being transmitted are not in accordance with the terms of this Agreement, the Trustees of any Fund or the Union shall have the right after giving notice to inspect the books of any Employer or to have an examination of same made by a Certified Public Accountant. In the event any discrepancy is discovered, the Employer shall bear the accounting cost incurred by the Trustees of the Union.

**Section 5. Required Documents.** Prior to or immediately upon any Employer becoming signatory to the Agreement they shall furnish the following to the Union:

(A) A Certificate of Workman Compensation Insurance Policy issued by a Company authorized to do business in the State of Illinois.

(B) Employer's State and Federal Tax Identification Numbers.

(C) A copy of the Illinois State Certificate regarding Unemployment Insurance Compensation.

(D) A Surety Bond may be required of any Employer who was not signatory to the previous Agreement or has been listed as a delinquent contributor by Health and Welfare and/or Pension Funds included in this Agreement. In the event that any Employer, covered by this Agreement, should become delinquent, such Employer shall be required to post a bond in the amount specified below, or at the Union's option, provide a cash bond in the same amount.

| | |
|---|---|
| One (1) to Five (5) Employees | $ 10,000.00 |
| Five (5) to Ten (10) Employees | 15,000.00 |
| Ten (10) to Fifteen (15) Employees | 20,000.00 |
| Fifteen (15) or more Employees | 25,000.00 |

**Section 6.** Each Employer shall be required to furnish, at his own cost and expense, a bond, with a recognized and responsible corporate surety, in an amount determined by the Local Union guaranteeing the payment of wages, all payroll deductions and fringes as set forth in Addendum A or he shall deposit and maintain with the Local Union, as collateral security for the payment of wages and fringes an amount in cash or in securities acceptable to the Local Union. The amount of bond, cash or securities shall be based upon an estimated amount

equal to thirty (30) days wages and fringes. After the Employer has employed Employees of the Union for two (2) years without default in payment of wages and fringes, he will not be required to furnish such bond or securities.

**Section 7. Failure to Comply.** Anything to the contrary notwithstanding, the Union shall have the right to picket for non-payment of wages, fringes and/or other deducts from Employee's check, after giving five (5) days notice to the Owner's Representative, Contractor and Sub-Contractor where applicable.

Failure of the Employer to comply with the provisions of Articles I, III or VII, Pre-job Conference shall permit the Union the same options upon giving of thirty (30) hours notice to the same parties. It is understood that time is of the essence as regards to compliance and in order to be in full compliance an Employer will have to comply with the requirements of the Agreement at the time specified therein. The remedy provided for herein for the Union, shall not be exclusive of any other remedy by the way of suit in law or in equity, or otherwise whether brought by the Union or in the case of the Fringe Benefit Funds, by the Trustees or Administrators of any of the Funds.

## ARTICLE XXIII
## EMPLOYERS WORKING

**Section 1.** Three (3) Owner/Partners may work with their tools on construction projects within the Mid-Central Illinois Regional Council, but must observe and comply with all applicable work rules and by-laws, and shall remit all fringe benefits, dues checkoff and assessments in effect, in accordance with this Agreement on all hours worked.

## ARTICLE XXIV
## TOOLS & EQUIPMENT

**Section 1. Cutting and Welding.** Employees covered by this Agreement shall do all cutting and welding whether acetylene or electric when used in connection with any work within the jurisdiction of this Agreement. Any employee covered by this Agreement in cutting or welding shall be furnished an Employee, from within the bargaining unit, currently on the job site to watch after his safety and to protect him from fire, if it is determined necessary by the Job Superintendent.

The Employer shall furnish when engaged in any burning or welding, if required, such protective clothing as gloves, sleeves, aprons, and hoods.

All Employees who are engaged in certified welding shall receive not less than fifty cents ($.50) per hour above the minimum hourly rate of pay.

**Section 2.** The Employer shall furnish all drill bits, hacksaw blades, files, taps and dies, all socket wrenches of over 1/2" drive, all power tools and all star drills.

**Section 3.** Employers and Employees shall observe all necessary safety precautions.

**Section 4.** No power tools shall be used on any job of the Employer that are found to be unsafe by the Steward or Business Representative of the Local Union.

**Section 5.** All Employees shall have their tools sharp when they report to work on a job.

**Section 6.** The Employer shall provide, as required by job conditions, a suitable shed or facility for the exclusive use of Bargaining Unit Employees. Such facilities shall be heated, lighted and ventilated.

**Section 7. Hand Tools that an Employee is Required to Furnish.** Each Employee is required to furnish, for his individual use only, all of those hand tools customarily required of an Employee to perform his duties.

**Section 8. Tools that an Employer is Required to Furnish.** The Employer shall furnish all power operated tools, machinery and equipment, pop-rivet guns, dry-wall squares, Whitney punches, metric tools, dial indicators, micrometer over one inch (1"), precision levels over eight inches (8"), adjustable wrenches over twelve inches (12"), sockets over one-half inch (1/2") drive, open-end or box wrenches over one and one-eight inches (1 1/8"), taps, dies and reamers. The Employer shall replace all expendable tools such as drill bits, taps, hack-saw blades, files, hammer handles, etc. that are worn out or broken on the job that an Employee may use in the performance of his duties.

**Section 9. Employers Responsibility for Employees Tools that are Lost because of Fire, Theft or Water Damage.** The Employee shall at all times be responsible for his own tools during working hours. In the event said tools are stored in the job tool box or tool shed under the control of the Employer, in which case the Employer agrees to assume responsibility for theft, fire or water damage of all tools not to exceed Four Hundred Dollars ($400.00) for Carpenter Tools and One Thousand Dollars ($1,000.00) for Millwright Tools. When said tools are lost or dam-

aged by cause as herein stated, the Employer agrees that he will, within three (3) working days, replace the tools with like quality tools, or if they are not available at that time will reimburse the Employee for his loss at current replacement value. If requested by the Employer, the Employee will furnish a complete inventory upon arrival at the job site.

# ARTICLE XXV
## MISCELLANEOUS

**Section 1.** At least one (1) Carpenter shall be employed during the pouring of concrete in or on forms built to hold concrete except when pouring concrete in forms for sidewalks, slabs on grade, curbs and gutters. He will perform such work as assigned in the area within view of the pour.

**Section 2. Tool Crib.** At any time Tool Cribs are used on jobs and an Employer is made responsible for issuing such tools and equipment as are used by members of the Bargaining Unit, a Bargaining Unit Employee shall be placed in charge of such facilities in order that such tools or equipment may be maintained and issued in good order.

**Section 3.** The Employer shall furnish or have reasonably conveniently available toilets for Employees on all jobs.

**Section 4.** These toilets shall be placed at the time work starts and continued until such time as the permanent toilets are put in operating condition. Whenever temporary toilets are to be provided, they shall be provided with water for flushing and shall be connected to a sanitary sewer, or shall be of a chemical type. In case of chemical toilets, these units will be serviced as needed or required to keep them in a sanitary condition. Pit privies will not be permitted.

# ARTICLE XXVI
## FRINGE BENEFITS

**Section 1.** It is agreed that the Union will have the option of accepting contributions in Health and Welfare, Annuity, Training Fund and Pension Fund in lieu of wages with the approval of the Trustees of the respective Funds.

In the event the contributions required to be paid into the respective Health and Welfare is increased by order or resolution of Trustees at a later date, such increase shall be deducted by the Employer from the Employee's wages and the Employer shall remit such increases to the respective Funds. Provided, however, that the change is made at the anniversary date of the Agreement.

**Section 2.** If payment is not received in the Fund Office on or before the day of the month due, such payment is subject to a late payment charge plus collection costs.

**Section 3.** Upon receipt of notice in writing to the Employers from the Union, the Employer shall contribute an amount, as designated in such notice, to an Annuity plan in lieu of wages. The contribution for such an Annuity plan shall be paid in lieu of wages, and shall be effective on the next anniversary date of the Agreement, unless the Annuity contribution is deducted from the Pension contribution, then it shall be effective on the first day of the calendar month following thirty (30) days advance notice. For example, if such notice is given on May 20, the contribution shall be effective July 1.

**Section 4.** Apprenticeship - Training Funds, IAF Funds and Dues Check Offs shall be in accordance with the Area Agreements. These Funds shall be increased or decreased on the anniversary date of the Agreement if possible. In case of necessity, these Funds shall be increased or decreased on the first day of the calendar month following thirty (30) days advance notice. For example, if such notice is given on May 20, the contribution shall be effective July 1.

The Trustees, through their Fund Auditor, may examine the pertinent payroll records of each Employer at the Employer's place of business, whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the trust.

Each Employer shall pay all fringe benefits and check offs and deductions on all Employees into the respective Fringe Benefit Funds in the jurisdiction of each Local Union within the Regional Council in which the Employer has been working.

## ARTICLE XXVII
## INDUSTRY ADVANCEMENT FUND

**Section 1.** Associations signatory to this Agreement, with an Industry Advancement Fund, hereinafter called IAF, shall be financed by payments provided for the purpose of the said IAF, which purposes shall be generally, to benefit and promote the building construction industry. Provided, however, that no expenditure from said Fund shall be made for any activity injurious to the Union.

**Section 2.** No part of the Funds allocated for the Industry Advancement Fund shall be spent directly or indirectly for any of the following purposes:

-42-

(A) Promotion of legislation opposed by the Union or opposition to legislation favored by the Union;

(B) Subsidies, indemnities or payments of any kind to Contractors during, for, or in connection with a period of strike, lockout or work stoppage;

(C) Litigation before any court or administrative body against the Union or the payment of any expenses directly or indirectly involved in any such litigation;

(D) Publicity or Public Relations Campaigns in support of Management's position respecting pending or prospective bargaining negotiations with the Union; Any activity injurious to the Union.

**Section 3.** Failure to make IAF contribution shall be deemed a direct violation of this agreement. Any employer signatory to this agreement who fails to make the IAF contribution shall be subject to a penalty of ten percent (10%) of the previous month's non-payment. Additional penalties of ten percent (10%) shall be due every thirty (30) days thereafter, until payment is made. A non-contributing contractor will also be subject to all reasonable legal collection fees relating to the non-payment of the IAF contribution.

## ARTICLE XXVIII
## CHECK OFF PER CAPITA TAX

**Section 1.** Upon receipt of an Employee's written authorization, which shall be irrevocable for not more than one (1) year, or the termination of Agreement, whichever occurs sooner, the Employer shall deduct from such Employee's wages in the amounts provided in the Addendum of this Agreement, the dues; for the Mid-Central Illinois Regional Council of Carpenters and the wage assessment Local Union Funds with which the Local Unions are party hereto and affiliated and remit same to the duly authorized Representative of the Mid-Central Illinois Regional Council of Carpenters and the Local Unions as directed in writing by said Council together with a list of the names of Employees from whose pay deductions are made.

Such written authorization may be revoked by the Employee by written notice by registered or certified mail to the Employer, the respective Local Union, and the Mid-Central Illinois Regional Council of Carpenters received by all during the ten (10) day period prior to the end of any applicable yearly period, or during the ten (10) day period prior to termination of any applicable Collective Bargaining Agreement, whichever occurs sooner. In

-43-

the absence of such revocation, sent and received in accordance with the foregoing, the authorization shall be renewed by an additional yearly period or until the end of the Collective Bargaining Agreement, whichever occurs sooner.

## ARTICLE XXIX
## REPORTING

**Section 1.** Nothing in this Agreement shall preclude the Contractor from stopping an Employee from coming to work at any time so long as the Employee is notified in adequate time before leaving his place of residence; the distance the Employee has to travel to the job shall be taken into consideration along with an understanding with the Employee as to the time he usually leaves for work. Employees may be notified either by radio station, in person or by telephone. It will be the responsibility of the Contractor or his designated Representative to obtain the address and telephone number of his Employees covered by this Agreement for the purpose stated above, and those Employees who cannot furnish an adequate way of contact shall sacrifice their rights for show-up time pay.

## ARTICLE XXX
## INCORPORATION OF ADDENDUM

**Section 1.** Minimum hourly wages, Health and Welfare payments, Pension Fund payments, Apprentice and Training Fund payments, Mid-Central Illinois Regional Council of Carpenters Funds, Annuity Funds and Industry Advancement Fund are included in the Addendum which is attached hereto and incorporated herein. The duration of said Addendum, unless otherwise specified, shall be the same duration as hereinafter provided. During the life of this contract wages will be paid to the Employees working for the Employer according to the wage scale set forth in the current Addendum to this Agreement.

## ARTICLE XXXI
## PROTECTIVE AND LIFE SAVING EQUIPMENT

**Section 1.** The Employer shall provide all items of personal, protective and life saving equipment as required by Federal or State regulations.

**Section 2.** The Employer shall furnish safety helmets and rain gear including boots when necessary and safety helmets will be worn by Employees at all times.

**Section 3.** The Employer shall have the right to discharge any Employee who fails to observe and follow all required safe-

ty rules and regulations after the Employee has been instructed and warned by the Foreman.

**Section 4.** It is expressly agreed that employees covered under this Agreement shall not be disciplined for refusing to work with, on, or under unsafe equipment or conditions, as defined by O.S.H.A. Regulations.

**Section 5.** It is recognized that there are important roles to be performed by both Management and Labor in the prevention of accidents and ensuring a safe and healthy working environment. The worksite should be maintained in a clean and orderly state, so as to encourage efficient and safe operations.

It is important to succeed in this cooperative effort because it is also recognized that failure can mean emotional and financial hardship for the Employee and a threat to the security of his or her family.

It is because of these mutual benefits that Labor and Management pledge to do all that is possible to maintain a safe, hazard-free working environment for all on the job, including initial and continuous training, regular inspections, establishment of emergency procedures and the commitment and cooperation of the parties to this Agreement.

**Section 6.** The Union should assist the Employer in maintaining safe work sites by promoting safety training to the employees covered under this Agreement. It is agreed that employees should complete an O.S.H.A. 10-Hour Safety and Health Training Course and any certified O.S.H.A. approved Training Program offered by the MCIDC Apprenticeship and Training School.

## ARTICLE XXXII
## MUTUAL AMENDMENT

**Section 1.** This Agreement shall be subject to amendment at any time by mutual consent of the parties hereto. Such amendment shall be reduced to writing; state the effective date thereof and be approved and executed in the same manner as this Agreement.

## ARTICLE XXXIII
## DRUG AND ALCOHOL POLICY

**Section 1.** Possession, sale or use of alcohol or non-prescription drugs on the Employer's property, site of construction or during the working hours regardless of the location shall be grounds for termination. Any Employee who reports to work

under the influence of alcohol or non-prescription drugs shall be subject to termination. "Non-prescription drugs" shall be defined as drugs which cannot be legally dispensed without a prescription and are not covered by a current valid prescription endorsed by a qualified physician for use by named Employee in question. Employees working under this Agreement shall be subject to all necessary diagnostic medical testing for purpose of verifying compliance with this provision, when required by the Employer at the expense of the Employer.

**Section 2.**    Parties agree that during the term of this contract, the Contractor shall not conduct random drug tests among Employees covered by this Agreement, but shall confine such drug or alcohol testing to instances where there is a reasonable cause. Reasonable cause shall include for example but is not limited to, visible impairment, possession, reports of on duty use, prior detection and rehabilitation, or involvement in an accident, injury or unsafe act.

**Section 3.**    Both parties agree to strive and work together towards an area wide substance abuse program similar to the EBOLT Program.

**Section 4.** Employees taking prescription medication which according to their physician has physical or mental side effects which could cause impairment on the job site, must report the medication to site supervision. Employees who report use of lawful medication as described above shall not be disciplined for use of same.

**Section 5.** Determination under this provision, including the circumstances surrounding the conduct of the drug or alcohol test, shall be fully subject to the grievance and arbitration provisions of this contract to the same extent and in the same amount as all other grievances as defined herein.

## ARTICLE XXXIV
## ENTIRE AGREEMENT OF THE PARTIES

This represents the entire Agreement of the parties. The Employer understanding that the Union is a fraternal society and, as such, in keeping with the provisions of the Labor Management Relations Act of 1947, as amended, has the right to prescribe its own rules and regulations with respect to any other matters or its own use. However, such rules and regulations whether contained in the By-laws, Constitution or otherwise shall have no effect, directly or indirectly, upon this Collective Bargaining Agreement, any employment relationship or the relationship between the parties.

## ARTICLE XXXV
## DURATION

This Agreement shall be effective **May 1, 2003**, and shall remain in full force and effect, until **April 30, 2006**, and shall continue in force from year to year thereafter except by written notice given by either party at least sixty (60) days, but not more than ninety (90) days, prior to April 30, 2006, or at least sixty (60) days, but not more than ninety (90) days prior to April 30, of any year thereafter, either party may notify the other of its desire to amend, modify or terminate this Agreement.

## ARTICLE XXXVI
## CORPORATE SIGNATURE AUTHORITY AND
## WAGE ADDENDUMS

For purposes of signing any union documents, a signature must be secured from a duly authorized officer of the Corporation, Company, Partnership or other recognized legal structure to be considered valid and binding. Under most circumstances a craft employee will not be allowed to sign on behalf of the Employer unless confirmation allowing this signature is received from the Company Office.

Wage Addendums are available upon request from the Mid-Central Illinois Regional Council of Carpenters, affiliated Local Unions and Signatory Contractor Associations.

# Mid-Central Illinois Regional Council Area Jurisdiction

**Local #16:** Counties of Christian, Menard, Sangamon and parts of Macoupin and Montgomery Counties.

**Local #44:** Champaign County, and parts of Ford, Douglas and Piatt Counties.

**Local #63:** Counties of Dewitt, Livingston, McLean and part of Ford County.

**Local #183:** Counties of Knox, Peoria, Warren, Woodford and parts of Tazewell County.

**Local #189:** Adams County.

**Local #269:** Vermillion County.

**Local #347:** Counties of Clark, Coles, Crawford, Cumberland, Edgar, Effingham, Jasper, Shelby and parts of Douglas and Moultrie Counties.

**Local #644:** Counties of Logan, McDonough, and parts of Fulton, Hancock, Mason, Peoria and Tazewell Counties.

**Local #725:** Counties of Macoupin and Montgomery.

**Local #742:** Macon County, and parts of Moultrie, Piatt and Sangamon Counties.

**Local #904:** Counties of Cass, Green, Morgan, Pike, Schuyler and Scott.

**Local #1051:** Entire 41 county area.

Contact the Mid-Central Illinois Regional Council of Carpenters or the appropriate Local Union for further details regarding the above information.

–48–



Mid-Central Illinois Regional Council of Carpenters Jurisdiction Map per Article II, Section 4, Page 2

–49–

**In Witness whereof,** the parties have caused this agreement to be signed, approved, and ratified by the duly authorized officers of the respective parties as of the day and year first above set forth.

CENTRAL ILLINOIS
BUILDERS OF AGC

*Dennis W. Larson*
Executive Vice President
Having authority to sign on
behalf of those Firms who have
assigned their bargaining rights
to the Association.

BUILDERS ASSOCIATION
OF TAZEWELL COUNTY

*Ken Aupperle*
Executive Vice President
Having authority to sign on
behalf of those Firms who have
assigned their bargaining rights
to the Association.

McLEAN COUNTY
CONTRACTORS GROUP

*John B. Meek*
President

Having authority to sign on
behalf of those Firms who have
assigned their bargaining rights
to the Association.

GREATER PEORIA
CONTRACTORS AND
SUPPLIERS ASSOCIATION,
INC.

*Kerry Rice*
Executive Vice President
Having authority to sign on
behalf of those Firms who have
assigned their bargaining rights
to the Association

MID-CENTRAL ILLINOIS
DISTRICT COUNCIL OF
CARPENTERS

*Daniel W. Smallwood*
President

*James C. Dalluge*
Executive Secretary Treasurer

*Terry L. Fairclough*
Carpenters, Local Union #16

*Michael E. Dummitt*
Carpenters, Local Union #44

*Donald L. Aisman*
Carpenters, Local Union #63

*Darrell A. Moody*
Carpenters, Local Union #183

*Roger Schoenekase*
Carpenters, Local Union #189

*Lawrence Lee High*
Carpenters, Local Union #269

*Donald L. Nelson*
Carpenters, Local Union #347

*Perry Sundell*
Carpenters, Local Union #644

*Scott Snow*
Carpenters, Local Union #725

*Daniel W. Smallwood*
Carpenters, Local Union #742

*Roger West*
Carpenters, Local Union #904

*Paul Leonard*
Millwright, Local Union #1051

## RECOGNITION AGREEMENT AND ADOPTION OF ALL COLLECTIVE BARGAINING AGREEMENTS TO WHICH THE MID-CENTRAL ILLINOIS REGIONAL COUNCIL OF CARPENTERS IS A PARTY

This AGREEMENT made and entered into by and between _____ _____ ("the EMPLOYER") and the MID-CENTRAL ILLINOIS REGIONAL COUNCIL OF CARPENTERS, affiliated with the United Brotherhood of Carpenters and Joiners of America ("the REGIONAL COUNCIL").

In consideration of the benefits to be derived and other good and valuable consideration, the parties agree and contract as follows:

1. The EMPLOYER agrees that if a majority of its employ-ees authorize the REGIONAL COUNCIL to represent them in collective bargaining, the EMPLOYER will recognize the REGIONAL COUNCIL as the National Labor Relations Act Section 9(a) majority collective bargaining agent for all employ-ees performing carpentry work on all present and future jobsites, within the REGIONAL COUNCIL's territorial jurisdiction.

2. The parties agree to be bound by and observe the terms and conditions of all current collective bargaining agreements to which the REGIONAL COUNCIL is a party, including, but not limited to, the REGIONAL COUNCIL's May 1, 2003 to April 30, 2006 Master Agreement, titled "Collective Bargaining Agreement between Central Illinois Builders of A.G.C., Builders Association of Tazewell County, McLean County Contractors Group, Greater Peoria Contractors and Suppliers Association Inc., and Mid-Central Illinois Regional Council of Carpenters".

3. Further, the EMPLOYER agrees to be bound by and observe the terms and conditions of any and all successor agreements negotiated by the REGIONAL COUNCIL covering all employees performing carpentry work, unless the EMPLOY-ER provides the REGIONAL COUNCIL written notice of its intent to amend or terminate the current collective bargaining agree-ment or any successor agreement at least sixty (60) days, but not more than ninety (90) days prior to said agreement's expira-tion date.

4.     Relevant EMPLOYER Information:

Federal Identification No.:

Unemployment No.:

Certification of Workers' Compensation Insurance Coverage:

Name     of     Workers'     Compensation     Insurance     Carrier:

Expiration Date of Workers' Compensation Insurance Policy:

Name and Address of Insurance Agent:

5.     THIS AGREEMENT is to be given full force and effect
as of the date that appears below.

IN WITNESS WHEREOF, the parties have executed this
Agreement this _____ day of _____,_____.
                              (Month)              (Year)

Name of Company                    MID-CENTRAL ILLINOIS
                                   REGIONAL COUNCIL
                                   OF CARPENTERS

Street Address                     #1 Kalmia Way

City              State    Zip     Springfield, Illinois 62702

(Area Code)   Telephone Number     (217) 744-1831

By: (Please Print)                 By: _____
                                   Business Representative for
                                   Carpenters Local #

Signature                          Business Representative's
                                   Telephone Number

Title

-52-

**Minimum hourly wage to be paid by the Employer to the employees effective:**

|  | 08-01-97 | 08-01-98 | 08-01-99 |
|---|---|---|---|
| **JOURNEYMAN CARPENTER** | $14.50 | $14.75 | $15.00 |
| **CARPENTER FOREMAN** | $15.50 | $15.75 | $16.00 |

**Minimum hourly wage to be paid to apprentices:**

| 01 thru 04 months.....40% | 25 thru 30 months.....85% |
|---|---|
| 05 thru 12 months.....50% | 31 thru 36 months.....90% |
| 13 thru 18 months.....60% | 37 thru 48 months.....95% |
| 19 thru 24 months.....75% |  |

SEP 0 4 1997

In addition to the above wages, the Employer shall pay for each hour worked by employees covered by this agreement to the Illinois Employees Benefit Corp., PO Box 92871, Chicago IL 60675-2871 the following:

|  | 08-01-97 | 08-01-98 | 08-01-99 |
|---|---|---|---|
| **PENSION FUND:** | $ 2.00 | $2.00 | $2.00 |

In addition to the above wages the Employer shall pay for each hour worked by employees covered by this agreement to the Central Illinois Carpenters Health and Welfare Fund, PO Box 1960, Peoria IL 61656-1960 the following:

|  | 08-01-97 | 08-01-98 | 08-01-99 |
|---|---|---|---|
| **HEALTH & WELFARE FUND:** | $ 2.80 | * | * |
| **MCIDCC APPRENTICESHIP FUND:** | $ .15 | $ .15 | $ .15 |
| **UBC HEALTH & SAFETY FUND:** | $ .03 | $ .03 | $ .03 |
| **UBC APPRENTICESHIP FUND:** | $ .03 | $ .03 | $ .03 |
| **ANNUITY:** | $ .85 | $ 1.10 | $ 1.35 |

\*THE EMPLOYER SHALL PAY HEALTH & WELFARE INCREASE FOR TERM OF CONTRACT.

Pension and Health & Welfare contributions to be waived by agreement of all parties for the first 90 days of employee "probationary period" (see ARTICLE IV SECTION 1 last ¶).

The Employer shall deduct from the employees wages for each hour worked by the employees covered by this agreement the following:

|  | 08-01-97 | 08-01-98 | 08-01-99 |
|---|---|---|---|
| **MCIDCC Check Off** | $ .29 | $ .30 | $ .30 |
| **W Cntrl IL Bldg Trades eight cents** | $ .08 | $ .08 | $ .08 |
| **Local Union Check Off–1/2%** | $ .05 | $ .07 | $ .08 |

This wage addendum shall be applicable only to the geographic jurisdiction of Carpenters Local Union #183.

**CARPENTERS LOCAL UNION #183**
      affiliated with
**MID-CENTRAL IL DISTRICT COUNCIL**
**U.B. of C. & J. OF A.**

**COMPANY NAME & ADDRESS:**
R. J. Unes Construction
8010 N. Sommer St
Peoria IL 61615

**BY:** _Betty Kepley_

**TITLE:** _Business Manager_

**BY:** _Robert Q. Unes_

**PRINT NAME:** _Robert J. UNES_

**TITLE:** _President_

**PHONE:** 309/698-1830

**PHONE:** (309) 693-9356

**DATE:** _8-1-97_

**DATE:** _Aug. 1, 1997_

SEP 0 4 1997

RESIDENTIAL CONSTRUCTION AGREEMENT                                    13

## ARTICLE XVII

## DURATION

**SECTION 1:** This Agreement shall become effective this <u>1ST DAY OF AUGUST 1997</u> and shall remain in full force and effect until <u>JULY 31, 2000</u>. It shall continue in effect from year to year thereafter <u>August 1</u> to and including <u>July 31</u>, of each year, unless notice for amendment or termination is given in the manner provided for herein.

**SECTION 2. NOTICE TO AMEND OR TERMINATE.** Either party desiring to amend or terminate this Agreement must notify the other in writing at least sixty (60) days prior to the stated expiration date herein or the expiration of any subsequent renewal period.

**SECTION 3. MUTUAL AMENDMENT AT ANY TIME.** This Agreement shall be subject to amendment at any time by mutual consent of the parties hereto. Such amendment shall be reduced to writing:  state the effective date thereof and be approved and executed in the same manner as this Agreement.

**IN WITNESS WHEREOF, the parties hereto have executed this agreement this 1st day of August 1997:**

**CARPENTERS LOCAL UNION #183**
**affiliated with**
**MID-CENTRAL IL DISTRICT COUNCIL**
**U.B. of C. & J. OF A.**

BY: _Petty Kepley_

TITLE: _Business Manager_

PHONE:  **309/698-1830**

DATE: _8-1-97_

**COMPANY NAME & ADDRES**
_R. J. Unes Construction_
_8010 N. Sommer St_
_Peoria Il  61615_

BY: _Robert G. Unes_

PRINT NAME: _Robert J. Unes_

TITLE: _President_

PHONE: _(309) 693-9356_

DATE: _Aug. 1, 1997_